HOLTZMAN ET AL. *v.* SCHLESINGER ET AL.

No. A–150. Decided August 1, 1973

MR. JUSTICE MARSHALL, Circuit Justice.

This case is before me on an application to vacate a stay entered by a three-judge panel of the United States Court of Appeals for the Second Circuit. Applicants, a Congresswoman from New York and several Air Force officers serving in Asia, brought this action to enjoin continued United States air operations over Cambodia. They argue that such military activity has not been authorized by Congress and that, absent such authorization, it violates Art. I, § 8, cl. 11, of the Constitution.[1] The United States District Court agreed and, on applicants' motion for summary judgment, permanently enjoined respondents, the Secretary of Defense, the Acting Secretary of the Air Force, and the Deputy Secretary of Defense, from "participating in any way in military activities in or over Cambodia or releasing any bombs which may fall in Cambodia." However, the effective date of the injunction was delayed until July 27, 1973, in order to

---

[1] Article I, § 8, cl. 11, provides: "The Congress shall have Power . . . To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water."

give respondents an opportunity to apply to the Court of Appeals for a stay pending appeal. Respondents promptly applied for such a stay, and the application was granted, without opinion, on July 27.[2] Applicants then filed this motion to vacate the stay. For the reasons stated below, I am unable to say that the Court of Appeals abused its discretion in staying the District Court's order. In view of the complexity and importance of the issues involved and the absence of authoritative precedent, it would be inappropriate for me, acting as a single Circuit Justice, to vacate the order of the Court of Appeals.

I

Since the facts of this dispute are on the public record and have been exhaustively canvassed in the District Court's opinion, it would serve no purpose to repeat them in detail here. It suffices to note that publicly acknowledged United States involvement in the Cambodian hostilities began with the President's announcement on April 30, 1970,[3] that this country was launching attacks "to clean out major enemy sanctuaries on

---

[2] At the same time, the Court of Appeals ordered an expedited briefing schedule and directed that the appeal be heard on August 13. In the course of oral argument on the stay, Acting Chief Judge Feinberg noted that either side could submit a motion to further advance the date of argument. Counsel for applicants indicated during argument before me that he intends to file such a motion promptly. Moreover, the Solicitor General has made representations that respondents will not oppose the motion and that, if it is granted, the case could be heard by the middle of next week. This case poses issues of the highest importance, and it is, of course, in the public interest that those issues be resolved as expeditiously as possible.

[3] It appears, however, that covert American activity substantially predated the President's April 30 announcement. See, e. g., the New York Times, July 15, 1973, p. 1, col. 1 ("Cambodian Raids Reported Hidden before '70 Foray").

the Cambodian-Vietnam border,"[4] and that American military action in that country has since met with gradually increasing congressional resistance.

Although United States ground troops had been withdrawn from the Cambodian theater by June 30, 1970, in the summer of that year Congress enacted the so-called Fulbright Proviso prohibiting the use of funds for military support of Cambodia.[5] The following winter, Congress re-enacted the same limitation with the added proviso that "nothing contained in this section shall be construed to prohibit support of actions required to insure the safe and orderly withdrawal or disengagement of U. S. Forces from Southeast Asia, or to aid in the release of Americans held as prisoners of war." 84 Stat. 2037. These provisions have been attached to every subsequent military appropriations act.[6] Moreover, in the Special Foreign Assistance Act of 1971, Congress prohibited the use of funds to support American ground combat troops in Cambodia under any circumstances and expressly provided that "[m]ilitary and economic assistance provided by the United States to Cambodia . . . shall not be construed as a commitment by the United States to Cambodia for its defense."[7]

Congressional efforts to end American air activities in Cambodia intensified after the withdrawal of American ground troops from Vietnam and the return of American prisoners of war. On May 10, 1973, the House of Rep-

---

[4] The Situation in Southeast Asia, 6 Presidential Documents 596, 598 (1970).

[5] The Fulbright Proviso states:
"Nothing [herein] shall be construed as authorizing the use of any such funds to support Vietnamese or other free world forces in actions designed to provide military support and assistance to the Government of Cambodia or Laos." 84 Stat. 910.

[6] See 85 Stat. 423; 85 Stat. 716; 86 Stat. 734; 86 Stat. 1184.

[7] 84 Stat. 1943. See also 22 U. S. C. § 2416 (g) (1970 ed., Supp. II).

resentatives refused an administration request to authorize the transfer of $175 million to cover the costs of the Cambodian bombing. See 119 Cong. Rec. 15291, 15317–15318 (1973). Shortly thereafter, both Houses of Congress adopted the so-called Eagleton Amendment prohibiting the use of any funds for Cambodian combat operations.[8] 119 Cong. Rec. 17693, 21173. Although this provision was vetoed by the President, an amendment to the Continuing Appropriations Resolution was ultimately adopted and signed by the President into law which stated:

> "Notwithstanding any other provision of law, on or after August 15, 1973, no funds herein or heretofore appropriated may be obligated or expended to finance directly or indirectly combat activities by United States military forces in or over or from off the shores of North Vietnam, South Vietnam, Laos or Cambodia." H. J. Res. 636, The Joint Resolution Continuing Appropriations for Fiscal Year 1974, Pub. L. 93–52,[9] § 108, 87 Stat. 134.

---

[8] The Eagleton Amendment provided:

"None of the funds herein appropriated under this Act or heretofore appropriated under any other Act may be expended to support directly or indirectly combat activities in, over or from off the shores of Cambodia or in or over Laos by United States forces." 119 Cong. 17124 (1973).

[9] The President contemporaneously signed the Second Supplemental Appropriations Act, 1973, Pub. L. 93–50, which contained a provision, § 307, 87 Stat. 129, stating that

"[n]one of the funds herein appropriated under this Act may be expended to support directly or indirectly combat activities in or over Cambodia, Laos, North Vietnam and South Vietnam or off the shores of Cambodia, Laos, North Vietnam and South Vietnam by United States forces, and after August 15, 1973, no other funds heretofore appropriated under any other Act may be expended for such purpose."

## II

Against this background, applicants forcefully contend that continued United States military activity in Cambodia is illegal. Specifically, they argue that the President is constitutionally disabled in nonemergency situations from exercising the warmaking power in the absence of some affirmative action by Congress. See, *e. g., Bas* v. *Tingy,* 4 Dall. 37 (1800); *Talbot* v. *Seeman,* 1 Cranch 1 (1801); *Mitchell* v. *Laird,* 159 U. S. App. D. C. 344, 348, 488 F. 2d 611, 615 (1973); *Orlando* v. *Laird,* 443 F. 2d 1039, 1042 (CA2 1971). Cf. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952). In light of the Fulbright Proviso, applicants take the position that Congress has never given its assent for military activity in Cambodia once American ground troops and prisoners of war were extricated from Vietnam.

With the case in this posture, however, it is not for me to resolve definitively the validity of applicants' legal claims. Rather, the only issue now ripe for decision is whether the stay ordered by the Court of Appeals should be vacated. There is, to be sure, no doubt that I have the power, as a single Circuit Justice, to dissolve the stay. See *Meredith* v. *Fair,* 83 S. Ct. 10, 9 L. Ed. 2d 43 (1962) (Black, J., Circuit Justice); 28 U. S. C. §§ 1651, 2101 (f). But at the same time, the cases make clear that this power should be exercised with the greatest of caution and should be reserved for exceptional circumstances. Cf. *Aberdeen & Rockfish R. Co.* v. *SCRAP,* 409 U. S. 1207, 1218 (1972) (BURGER, C. J., Circuit Justice).

Unfortunately, once these broad propositions are recognized, the prior cases offer little assistance in resolving this issue, which is largely *sui generis.* There are, of course, many cases suggesting that a Circuit Justice should "balance the equities" when ruling on stay ap-

plications and determine on which side the risk of irreparable injury weighs most heavily. See, *e. g., Long Beach Federal Sav. & Loan Assn.* v. *Federal Home Loan Bank,* 76 S. Ct. 32, 100 L. Ed. 1517 (1955) (DOUGLAS, J., Circuit Justice); *Board of Education* v. *Taylor,* 82 S. Ct. 10 (1961) (BRENNAN, J., Circuit Justice); *Socialist Labor Party* v. *Rhodes,* 89 S. Ct. 3, 21 L. Ed. 2d 72 (1968) (STEWART, J., Circuit Justice).

But in this case, the problems inherent in attempting to strike an equitable balance between the parties are virtually insurmountable. On the one hand, applicants assert that if the stay is not vacated, the lives of thousands of Americans and Cambodians will be endangered by the Executive's arguably unconstitutional conduct. Applicants argue, not implausibly, that if the stay is not vacated, American pilots will be killed or captured, Cambodian civilians will be made refugees, and the property of innocent bystanders will be destroyed.

Yet, on the other hand, respondents argue that if the bombing is summarily halted, important foreign policy goals of our Government will be severely hampered. Some may greet with considerable skepticism the claim that vital security interests of our country rest on whether the Air Force is permitted to continue bombing for a few more days, particularly in light of respondents' failure to produce affidavits from any responsible Government official asserting that such irreparable injury will occur.[10] But it cannot be denied that the assessment of such injury poses the most sensitive of problems, about which Justices of this Court have little or no information or expertise. While we have undoubted authority to judge

---

[10] While respondents offered to produce testimony at trial by high Government officials as to the importance of the bombing, no affidavits by such officials alleging irreparable injury in conjunction with the stay application were offered.

the legality of executive action, we are on treacherous ground indeed when we attempt judgments as to its wisdom or necessity.[11]

The other standards utilized for determining the propriety of a stay are similarly inconclusive. Opinions by Justices of this Court have frequently stated that lower court decisions should be stayed where it is likely that four Members of this Court would vote to grant a writ of certiorari. See, *e. g., Edwards* v. *New York,* 76 S. Ct. 1058, 1 L. Ed. 2d 17 (1956) (Harlan, J., Circuit Justice); *Appalachian Power Co.* v. *American Institute of C. P. A.,* 80 S. Ct. 16, 4 L. Ed. 2d 30 (1959) (BRENNAN, J., Circuit Justice); *English* v. *Cunningham,* 80 S. Ct. 18, 4 L. Ed. 2d 42 (1959) (Frankfurter, J., Circuit Justice). But to some extent, at least, this standard reflects a desire to maintain the status quo in those cases which the Court is likely to hear on the merits. See, *e. g., In re Bart,* 82 S. Ct. 675, 7 L. Ed. 2d 767 (1962) (Warren, C. J., Circuit Justice); *McGee* v. *Eyman,* 83 S. Ct. 230, 9 L. Ed. 2d 267 (1962) (DOUGLAS, J., Circuit Justice). This case is unusual in that regardless of what action I take, it will likely be impossible to preserve this controversy in its present form for ultimate review by this Court. Cf. *O'Brien* v. *Brown,* 409 U. S. 1, 9–10 (1972) (MARSHALL, J., dissenting). On August 15, the statutory ban on Southeast Asian military activity will take effect, and the contours of this dispute will then be irrevocably altered. Hence, it is difficult to justify a stay for the purpose of preserving the status quo, since no action by this Court can freeze the issues in their present form.[12]

---

[11] For similar reasons, it would be a formidable task to judge where the public interest lies in this dispute, as courts traditionally do when determining the appropriateness of a stay. See, *e. g., O'Brien* v. *Brown,* 409 U. S. 1, 3 (1972).

[12] I do not mean to suggest that this dispute will necessarily be moot after August 15. That is a question which is not now before

To some extent, as well, the "four-vote" rule reflects the policy in favor of granting a stay only when the losing party presents substantial contentions which are likely to prevail on the merits. See, *e. g., O'Brien v. Brown, supra; Rosenberg v. United States,* 346 U. S. 273, 313 (1953) (DOUGLAS, J., Circuit Justice); *Railway Express Agency v. United States,* 82 S. Ct. 466, 7 L. Ed. 2d 432 (1962) (Harlan, J., Circuit Justice); *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers,* 396 U. S. 1201 (1969) (Black, J., Circuit Justice). In my judgment, applicants' contentions in this case are far from frivolous and may well ultimately prevail. Although tactical decisions as to the conduct of an ongoing war may present political questions which the federal courts lack jurisdiction to decide, see, *e. g., DaCosta v. Laird,* 471 F. 2d 1146 (CA2 1973), and although the courts may lack the power to dictate the form which congressional assent to warmaking must take, see, *e. g., Massachusetts v. Laird,* 451 F. 2d 26 (CA1 1971); *Mitchell v. Laird,* 159 U. S. App. D. C. 344, 488 F. 2d 611 (1973), there is a respectable and growing body of lower court opinion holding that Art. I, § 8, cl. 11, imposes some judicially manageable standards as to congressional authorization for warmaking, and that these standards are sufficient to make controversies concerning them justiciable. See *Mitchell v. Laird, supra; DaCosta v. Laird, supra; Orlando v. Laird,* 443 F. 2d 1039 (CA2 1971); *Berk v. Laird,* 429 F. 2d 302 (CA2 1970).

Similarly, as a matter of substantive constitutional law, it seems likely that the President may not wage war without some form of congressional approval—except, perhaps, in the case of a pressing emergency or when

me and upon which I express no views. Moreover, even if the August 15 fund cutoff does moot this controversy, applicants may nonetheless be able to secure a Court of Appeals determination on the merits before August 15. See n. 2, *supra.*

1312

the President is in the process of extricating himself from a war which Congress once authorized. At the very beginning of our history, Mr. Chief Justice Marshall wrote for a unanimous Court that:

> "The whole powers of war being, by the constitution of the United States, vested in congress, the acts of that body can alone be resorted to as our guides in this enquiry. It is not denied . . . that congress may. authorize general hostilities, in which case the general laws of war apply to our situation; or partial hostilities, in which case the laws of war, so far as they actually apply to our situation, must be noticed." *Talbot* v. *Seeman,* 1 Cranch 1, 28 (1801).

In my judgment, nothing in the 172 years since those words were written alters that fundamental constitutional postulate. Cf. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952).

A fair reading of Congress' actions concerning the war in Cambodia may well indicate that the Legislature has authorized only "partial hostilities"—that it has never given its approval to the war except to the extent that it was necessary to extricate American troops and prisoners from Vietnam. Certainly, this seems to be the thrust of the Fulbright Proviso.[13] Moreover, this Court

---

[13] The Solicitor General vigorously argues that by directing that Cambodian operations cease on August 15, Congress implicitly authorized their continuation until that date. But while the issue is not wholly free from doubt, it seems relatively plain from the face of the statute that Congress directed its attention solely to military actions after August 15, while expressing no view on the propriety of ongoing operations prior to that date. This conclusion gains plausibility from the remarks of the sponsor of the provision—Senator Fulbright—on the Senate floor:

"The acceptance of an August 15 cutoff date should in no way be interpreted as recognition by the committee of the President's

could easily conclude that after the Paris Peace Accords, the Cambodian bombing is no longer justifiable as an extension of the war which Congress did authorize and that the bombing is not required by the type of pressing emergency which necessitates immediate presidential response.

Thus, if the decision were mine alone, I might well conclude on the merits that continued American military operations in Cambodia are unconstitutional. But the Supreme Court is a collegial institution, and its decisions reflect the views of a majority of the sitting Justices. It follows that when I sit in my capacity as a Circuit Justice, I act not for myself alone but as a surrogate for the entire Court, from whence my ultimate authority in these matters derives. A Circuit Justice therefore bears a heavy responsibility to conscientiously reflect the views of his Brethren as best he perceives them, cf. *Meredith* v. *Fair*, 83 S. Ct. 10, 11, 9 L. Ed. 2d 43, 44-45 (1962) (Black, J., Circuit Justice), and this responsibility is particularly pressing when, as now, the Court is not in session.

When the problem is viewed from this perspective, it is immeasurably complicated. It must be recognized that we are writing on an almost entirely clean slate in this area. The stark fact is that although there have

---

authority to engage U. S. forces in hostilities until that date. The view of most members of the committee has been and continues to be that the President does not have such authority in the absence of specific congressional approval." 119 Cong. Rec. 22305 (1973). See also *id.*, at 22307.

While it is true that some Senators declined to vote for the proposal because of their view that it did implicitly authorize continuation of the war until August 15, see *id.*, at 22313 (remarks of Sen. Eagleton); 22309 (remarks of Sen. Bayh); 22317 (remarks of Sen. Muskie), it is well established that speeches by opponents of legislation are entitled to relatively little weight in determining the meaning of the Act in question.

been numerous lower court decisions concerning the legality of the war in Southeast Asia, this Court has never considered the problem, and it cannot be doubted that the issues posed are immensely important and complex. The problem is further complicated by the July 1, 1973, amendment to the Continuing Appropriations Resolution providing that "on or after August 15, 1973, no funds herein or heretofore appropriated may be obligated or expended to finance directly or indirectly combat activities by United States military forces in or over or from off the shores of North Vietnam, South Vietnam, Laos or Cambodia." 87 Stat. 134. This, it is urged, is the crux of this case and there is neither precedent nor guidelines toward any definitive conclusion as to whether this is or is not sufficient to order the bombings to be halted prior to August 15.

Lurking in this suit are questions of standing, judicial competence, and substantive constitutional law which go to the roots of the division of power in a constitutional democracy. These are the sort of issues which should not be decided precipitately or without the benefit of proper consultation. It should be noted, moreover, that since the stay below was granted in respondents' favor, the issue here is not whether there is some possibility that applicants will prevail on the merits, but rather whether there is some possibility that respondents will so prevail. In light of the uncharted and complex nature of the problem, I am unwilling to say that that possibility is nonexistent.

Finally, it is significant that although I cannot know with certainty what conclusion my Brethren would reach, I do have the views of a distinguished panel of the Court of Appeals before me. That panel carefully considered the issues presented and unanimously concluded that a stay was appropriate. Its decision, taken in aid of its own jurisdiction, is entitled to great weight. See, *e. g.,*

*United States ex rel. Knauff* v. *McGrath* (unreported opinion reprinted at 96 Cong. Rec. App. 3751 (1950)) (Jackson, J., Circuit Justice); *Breswick & Co.* v. *United States,* 75 S. Ct. 912, 100 L. Ed. 1510 (1955) (Harlan, J., Circuit Justice). In light of the complexity and importance of the issues posed, I cannot say that the Court of Appeals abused its discretion.

When the final history of the Cambodian war is written, it is unlikely to make pleasant reading. The decision to send American troops "to distant lands to die of foreign fevers and foreign shot and shell," *New York Times Co.* v. *United States,* 403 U. S. 713, 717 (1971) (Black, J., concurring), may ultimately be adjudged to have been not only unwise but also unlawful.

But the proper response to an arguably illegal action is not lawlessness by judges charged with interpreting and enforcing the laws. Down that road lies tyranny and repression. We have a government of limited powers, and those limits pertain to the Justices of this Court as well as to Congress and the Executive. Our Constitution assures that the law will ultimately prevail, but it also requires that the law be applied in accordance with lawful procedures.

In staying the judgment of the District Court, the Court of Appeals agreed to hear the appeal on its merits on August 13 and advised applicants to apply to that panel for an earlier hearing before that date. It is, therefore, clear to me that this highly controversial constitutional question involving the other two branches of this Government must follow the regular appellate procedures on the accelerated schedule as suggested by the Court of Appeals.

In my judgment, I would exceed my legal authority were I, acting alone, to grant this application. The application to vacate the stay entered below must therefore be

*Denied.*