NEW YORK ET AL. *v.* KLEPPE, SECRETARY OF THE INTERIOR, ET AL.

No. A–150.   Decided August 19, 1976

MR. JUSTICE MARSHALL, Circuit Justice.

On Friday, August 13, 1976, the United States District Court for the Eastern District of New York preliminarily enjoined the Secretary of the Interior from proceeding with plans to open, on August 17, 1976, sealed bids due to be submitted for oil and gas leases of submerged lands under the Mid-Atlantic Outer Continental Shelf.   On Monday, August 16, 1976, the United States Court of Appeals for the Second Circuit stayed the District Court's order.   The State of New York, the Natural Resources Defense Council, and the counties of Suffolk and Nassau, plaintiffs in the District Court, applied to me as Circuit Justice to vacate the stay.   After holding oral argument, I concluded that the extraordinary relief they requested was not warranted.

I

The facts are exhaustively stated in the opinion of the District Court, and can be summarized briefly here.   In

January 1974, President Nixon directed the Department of the Interior to rapidly lease Outer Continental Shelf lands for mining of oil and natural gas. In accordance with this directive, the Department of the Interior prepared a preliminary environmental impact statement (EIS), held hearings on the statement, and in July 1975 issued a final impact statement, as required by § 102 (2)(C) of the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 853, 42 U. S. C. § 4332 (2)(C), On September 29, 1975, the Acting Secretary announced his decision to adopt the accelerated oil- and gas-leasing programs.

One of the areas to be leased under the accelerated program is an area designated as Mid-Atlantic Sale No. 40, consisting of lands off the coasts of New York, New Jersey, Delaware, Maryland, and Virginia. In August 1975, the Secretary announced which tracts within the area would be leased. A new EIS devoted specifically to Sale No. 40 was drafted, hearings were held in January 1976, and a final, four-volume EIS was issued in May 1976. On July 16, 1976, a notice of the proposed lease sale was published in the Federal Register, 41 Fed. Reg. 29437. Pursuant to the notice, sealed bids were to be submitted for each tract on a cash bonus basis, accompanied by one-fifth of the cash bonus in cash or by cashier's check, bank draft, certified check, or money order. The bids were due by 9:30 a. m., August 17, 1976, and were to be opened beginning at 10 a. m.; the notice stated that if the bids were not opened by midnight, they would be returned unopened to the bidder. *Ibid.* After opening the bids, the Secretary has 30 days to accept the highest bid, *ibid.,* see 43 CFR § 3302.5 (1975); if no bid is accepted within 30 days, all bids are deemed rejected, *ibid.* Once a bid is accepted, the bidder must sign a lease within a specified time or forfeit his deposit. *Ibid.* The lease grants the lessee the exclusive right to drill for, remove, and dispose of oil and gas deposits in the leased lands; however, the lessee must submit all exploratory drilling plans

and development plans to the supervisor of the lease for approval. 30 CFR § 250.34 (1975).

Prior to the publication of the notice of the lease sale, the plaintiffs instituted the instant action to enjoin the lease sale on the ground that the final EIS did not comply with the requirements of the NEPA. After 11 days of hearings the District Court issued a comprehensive opinion. In most respects, the Court found the EIS to be adequate, indeed "[i]f anything . . . too detailed and encyclopedic for a lay executive to fully comprehend." Nos. 76C1229 and 75C208 (EDNY Aug. 13, 1976). On one issue, however—an issue raised by the court *sua sponte* during the hearings—the court found the EIS materially deficient: it failed, in the court's view, to adequately analyze state laws governing the use of shorelines, and to evaluate "the probable extent of state cooperation [with] or opposition" to the offshore exploration program. To the contrary, the court found that the EIS assumed that the States would grant rights-of-way for pipelines on shorelands, thereby obviating the need for the lessees to use tankers to transport the oil and minimizing the risk of oil spills. The court concluded that as a result of this single omission, there was a likelihood that plaintiffs would succeed on the merits in demonstrating a violation of the NEPA, and it found that plaintiffs would be irreparably injured if the Secretary were permitted to grant the leases without prior compliance with the NEPA. Accordingly, the court issued a preliminary injunction.

The Secretary, joined by the National Ocean Industries Association which had intervened on the side of the Secretary, appealed the District Court's order and requested that the injunction be stayed. After hearing oral argument, the Court of Appeals granted the stay. In a brief *per curiam* opinion, the Court of Appeals stated:

"We find nothing in this case which satisfies us that the August 17, 1976 sale, in and of itself, will cause

appellees any irreparable injury. On the other hand, the national interests, looking toward relief of this country's energy crisis, will be clearly damaged if the proposed sale is aborted." No. 76–8369 (CA2 Aug. 16, 1976).

## II

The power of a Circuit Justice to dissolve a stay is well settled. See, *e. g., Holtzman* v. *Schlesinger,* 414 U. S. 1304, 1308 (1973) (MARSHALL, J., in chambers); *Meredith* v. *Fair,* 83 S. Ct. 10, 9 L. Ed. 2d 43 (1962) (Black, J., in chambers); *Cunningham* v. *English,* 78 S. Ct. 3, 2 L. Ed. 2d 13 (1957) (Warren, C. J., in chambers). But it is equally well established that a Circuit Justice should not disturb, "except upon the weightiest considerations, interim determinations of the Court of Appeals in matters pending before it." *O'Rourke* v. *Levine,* 80 S. Ct. 623, 624, 4 L. Ed. 2d 615, 616 (1960) (Harlan, J., in chambers). This is especially true where, as here, I had only a few hours to review the District Court's 200-page opinion, the briefs of the parties, and the four-volume EIS, and where I did not have before me—nor could I have meaningfully considered even if it were here—the voluminous record compiled in the District Court.

Perhaps the most compelling justification for a Circuit Justice to upset an interim decision by a court of appeals would be to protect this Court's power to entertain a petition for certiorari before or after the final judgment of the Court of Appeals. See R. Stern & E. Gressman, Supreme Court Practice § 17.19 (4th ed. 1969). Despite the practical importance of the Secretary of the Interior's decision to issue leases for the Mid-Atlantic Outer Continental Shelf, however, I am not persuaded that the legal question involved here—whether this EIS complied with the uncontested requirements of the NEPA—would warrant review by this Court. Just this past Term, in *Kleppe* v. *Sierra Club,* 427 U. S. 390 (1976), we had occasion to examine the purposes and requirements of the NEPA. Although we disagreed on certain issues, we were

unanimous in concluding that the essential requirement of the NEPA is that before an agency takes major action, it must have taken "a 'hard look' at environmental consequences." 427 U. S., at 410 n. 21, quoting *Natural Resources Defense Council* v. *Morton,* 148 U. S. App. D. C. 5, 16, 458 F. 2d 827, 838 (1972). In evaluating the adequacy of EIS's the Courts of Appeals consistently have enforced this essential requirement, tempered by a practical "rule of reason." [1] As the Court of Appeals for the Second Circuit has explained:

> "[A]n EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible." *Natural Resources Defense Council* v. *Callaway,* 524 F. 2d 79, 88 (1975).

In the instant case, respondents do not appear to challenge the requirement that the agency take a "hard look" at the environmental consequences, nor do applicants question the appropriateness of employing a rule of reason in evaluating impact statements. Thus, the sole question at issue is whether the District Court properly applied the controlling standards in concluding that the EIS lacked information concerning state regulation of shorelands which was "reasonably necessary" for evaluating the project. That question appropriately is for the Court of Appeals, and I do not believe that four Members of this Court would vote to grant a writ of certiorari to review its conclusion on such a fact-intensive issue. Accordingly, it is not appropriate for me to exercise my

---

[1] See, *e. g., Sierra Club* v. *Morton,* 510 F. 2d 813, 819 (CA5 1975); *Trout Unlimited* v. *Morton,* 509 F. 2d 1276, 1283 (CA9 1974); *Harlem Valley Transportation Assn.* v. *Stafford,* 500 F. 2d 328, 337 (CA2 1974); *Iowa Citizens for Environmental Quality* v. *Volpe,* 487 F. 2d 849, 852 (CA8 1973); *Natural Resources Defense Council* v. *Morton,* 148 U. S. App. D. C. 5, 12, 458 F. 2d 827, 834 (1972).

extraordinary powers as Circuit Justice in order to preserve a question for review by the full Court.

Nor is it necessary for me to act in this case "to preserve the rights of the parties pending final determination of the cause." *Meredith* v. *Fair*, 83 S. Ct., at 11, 9 L. Ed. 2d, at 44. The Court of Appeals concluded that plaintiffs would not be irreparably injured if the Secretary were permitted to open the bids. I cannot say that the court abused its discretion. It is axiomatic that if the Government, without preparing an adequate impact statement, were to make an "irreversible commitment of resources," *Natural Resources Defense Council* v. *NRC*, 539 F. 2d 824, 844 (CA2 1976), a citizen's right to have environmental factors taken into account by the decision-maker would be irreparably impaired. For this reason, the lower courts repeatedly have enjoined the Government from making such resource commitments without first preparing adequate impact statements.[2] Indeed this past Term, in *Kleppe* v. *Sierra Club, supra,* we indicated that it would have been appropriate for the Court of Appeals to have enjoined the approval of mining plans had that court concluded that "the impact statement covering [the mining plans] inadequately analyzed the environmental impacts of, and the alternatives to, their approval." 427 U. S., at 407–408, n. 16.

In the instant case, however, the Court of Appeals apparently decided that the opening of bids does not constitute an "irreversible commitment of resources." I am unprepared to say that the court was wrong in so holding. In the first instance, it is quite clear that the actual opening of the bids does not involve a commitment of any kind, since the Secretary reserves the right to reject all bids. Thus it is not until

---

[2] See, *e. g., Natural Resources Defense Council* v. *NRC; Environmental Defense Fund* v. *TVA,* 468 F. 2d 1164, 1183–1184 (CA6 1972); *Scherr* v. *Volpe,* 466 F. 2d 1027, 1034 (CA7 1972); *Calvert Cliffs' Coordinating Comm.* v. *AEC,* 146 U. S. App. D. C. 33, 52, 449 F. 2d 1109, 1128 (1971). See generally F. Anderson, NEPA in the Courts 239–246 (1973).

a bid is accepted—which may not happen for 30 days—that an irreversible commitment is even arguably made.[3] Moreover, even after the bids are accepted, I cannot say that the Court of Appeals would be without power to declare the leases invalid if the court determined that the Government entered into leases without compliance with the requirements of the NEPA.

For the foregoing reasons, I have concluded that this case does not present the "exceptional circumstances," *Holtzman* v. *Schlesinger*, 414 U. S., at 1308, that warrant a Circuit Justice to vacate a stay.

---

[3] In the instant case, it is possible that before the bids are accepted the District Court will decide that the defect in the EIS has been remedied by a supplemental affidavit prepared by the Secretary in response to the court's opinion. That affidavit was presented to the Court of Appeals as an appendix to the Government's brief; it was also presented to me, but because it had not yet been given to the District Court, I declined to consider it. I was informed at argument, however, that the affidavit discusses the extent to which the Secretary considered the possibility of lack of state cooperation in making his decision to approve Sale No. 40.