# Proposed Deployment of United States Armed Forces into Bosnia

*The President, acting without specific statutory authorization, may lawfully introduce United States ground troops into Bosnia in order to assist the North Atlantic Treaty Organization to ensure compliance with a peace agreement.*

November 30, 1995

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This is to provide you with our analysis of whether the President, acting without specific statutory authorization, lawfully may introduce United States ground troops into Bosnia and Herzegovina ("Bosnia") to help the North Atlantic Treaty Organization ("NATO") ensure compliance with the recently negotiated peace agreement. We believe that the President may act unilaterally in the circumstances here.

## I. Background

The United States has a large stake in helping to secure the Bosnian peace agreement. The United States has a firm commitment to the principle that the security and stability of Europe are of fundamental interest to the United States. As the President stated, if the negotiations fail and the war resumes, there is a very real risk that it could spread beyond Bosnia, and involve Europe's new democracies as well as our NATO allies.

Although the involvement of the United Nations in the Bosnian conflict can be traced back to at least 1991, the United Nations first deployed the United Nations Protection Force ("UNPROFOR") in the former Yugoslavia in April 1992. Most of the troops in UNPROFOR have been provided by nations allied with the United States under the NATO Treaty. In addition to operations involving ground forces, the Security Council, in Resolutions 781 and 786 (October 9 and November 10, 1992), established a ban on unauthorized military flights over Bosnia. In Security Council Resolution 816 (March 31, 1993), the Security Council authorized Member States and regional organizations to take "all necessary measures" to ensure compliance with the no-fly zone. The NATO allies agreed to undertake that enforcement. In Security Council Resolutions 836 and 844 (June 4 and 18, 1993), the Security Council authorized Member States and regional organizations (including NATO) to help protect UNPROFOR. In response to attacks on Sarajevo, NATO also agreed, on February 9, 1994, to accept the Secretary General's request to begin air operations, in coordination with

327

UNPROFOR, against military positions determined to be involved in attacks on civilian targets in Sarajevo.

Working with its NATO allies, the United States has played an important role in the United Nations' dispute-settlement efforts and in UNPROFOR's Bosnian operations. It contributed combat-equipped fighter aircraft and other resources to NATO's enforcement of the Security Council's no-fly ban. It also provided military assets to implement NATO's February 9, 1994, decision to attack military targets near Sarajevo. On occasion, United States military forces, under the auspices of NATO, have engaged in combat in support of UNPROFOR. On February 28, 1994, United States aircraft on air patrol for NATO engaged Serb aircraft violating the no-fly ban, destroyed three of them, and downed a fourth. On April 10–11, 1994, United States combat-equipped aircraft engaged Bosnian-Serb aircraft and gunners in defense of UNPROFOR personnel who had come under attack in Gorazde. On November 21, 1994, NATO conducted airstrikes involving thirty-nine United States and allied aircraft in response to Serb air attacks that had threatened 1,200 UNPROFOR troops in Bihac. The President reported each of these incidents by formal letters to Congress.

In a radio address of February 19, 1994, the President outlined the support the United States had given as of that time to the United Nations' effort in the former Yugoslavia:

> We have participated in the enforcement of economic sanctions against Serbia. We initiated airdrops of food and medicine and participated in the Sarajevo airlift, a massive effort, running longer than the Berlin airlift, which has relieved starvation and suffering for tens of thousands of Bosnians. Together with our NATO allies, we began enforcement of a no-fly zone to stop the parties from spreading the war with aircraft.
>
> We have warned Serbia against increasing its repression of the Albanian ethnic minority in Kosovo. We have contributed 300 American troops to the United Nations force that is helping to ensure that the war does not spread to the former Yugoslav Republic of Macedonia, which lies between Bosnia and Greece. And we have worked with our allies to ensure that NATO is prepared to help solve this crisis.

1 Pub. Papers of William J. Clinton 284 (1994).

More recently, after the Bosnian Serbs assaulted Srebenica and Zepa, which the United Nations had designated as safe areas, the United States organized an agreement with our NATO allies to take decisive military measures against any further attacks on safe areas. When the Bosnian Serbs later shelled a marketplace in Sarajevo, American pilots took part in a NATO bombing campaign designed to prevent the repetition of such offenses and ensure the withdrawal of heavy

weapons from around Sarajevo. Throughout this period, the President has informed Congress of the United States' involvement in supporting the UNPROFOR, including the episodes of combat that have occurred. [1]

In the past few months, the United States initiated an intensive diplomatic effort that produced a peace agreement among the warring parties in Bosnia. The United States had earlier assisted those parties in reaching a cease-fire. The peace agreement itself came out of negotiations that took place on American soil, under the guidance of the Department of State. The United Nations Security Council has indicated its support of the agreement. The parties to the agreement have made clear that their confidence in the strength of the accord depends on the presence of an international military force that would maintain the cease-fire and the separation of forces. It is anticipated that the United States would contribute 20,000 ground troops to the force and that our NATO allies, as well as such non-NATO countries as Russia, would provide twice that number. [2]

The President has determined that, without this substantial contingent of United States troops, the NATO force is unlikely to be able to prevent renewed fighting in Bosnia. The President bases this conclusion on (among other things) the representations of the parties and in particular of the Bosnians. A failure to carry out the terms of the peace accord, in the President's judgment, would injure America's national interests, as well as once again consigning the Bosnians to violence and atrocities of a sort not seen in Europe since the end of the Second World War. *See, e.g.*, Letter for Honorable Newt Gingrich, Speaker of the House of Representatives, from President William J. Clinton (Nov. 13, 1995) ("November 13 Letter"). The precise level of risk to United States troops is, of course, impossible to specify. As the President has stated, "America's role will not be about fighting a war. It will be about helping the people of Bosnia to secure their own peace agreement." The risk of casualties cannot be dismissed; "[t]here may be accidents in the field or incidents with people who have not given up their hatred." 2 Pub. Papers of William J. Clinton 1784, 1786 (1995). However, because of the size of the Implementation Force ("IFOR") and its rules of engagement, as well as the high quality of United States and NATO troops, training, and equipment, we would have created conditions that would offer the minimum possible risks to our soldiers.

---

[1] Congress has from time to time enacted legislation (or expressed its sense) on the United States' policy and role in the Bosnian conflict. *See, e.g.*, Department of Defense Appropriations Act, FY 1995, Pub. L. No. 103–335, § 8100, 108 Stat. 2599, 2643 (1994) (sense of Congress that none of funds appropriated under Act be available to deploy United States Armed Forces to participate in Bosnian peace settlement); National Defense Authorization Act, FY 1995, Pub. L. No. 103–337, § 1404, 108 Stat. 2663, 2910 (1994) (sense of Congress that President terminate arms embargo against Bosnia if certain conditions obtain); Foreign Operations, Export Financing, and Related Programs Appropriations Act, FY 1995, Pub. L. No. 103–306, § 546, 108 Stat. 1608, 1641 (1994) (same); Foreign Relations Authorization Act, FY 1994 & 1995, Pub. L. No. 103–236, § 520(c), 108 Stat. 382, 472 (1994) (President should provide military assistance to Bosnia if that nation requests it under Article 51 of United Nations Charter).

[2] Additional United States forces would also be deployed to areas outside Bosnia to support the ground troops inside the country.

## II. Legal Analysis

In 1980, we noted that

> [t]he power to deploy troops abroad without the initiation of hos-
> tilities is the most clearly established exercise of the President's
> general power as a matter of historical practice. Examples of such
> actions in the past include the use of the Navy to "open up" Japan,
> and President Johnson's introduction of the armed forces into the
> Dominican Republic in 1965 to forestall revolution.

*Presidential Power to Use the Armed Forces Abroad Without Statutory Authoriza-
tion*, 4A Op. O.L.C. 185, 187 (1980). Today, American soldiers are deployed at
many places around the world. Although these forces are not presently engaged
in ongoing hostilities, in some instances they deal with conditions of appreciable
danger. Indeed, continuously for the last forty years, American forces have been
deployed under such conditions. The United States, for example, has maintained
large military forces in Europe. At times, these troops have faced a genuine risk
of war, as during the Berlin Airlift. More recently, they have been subjected to
attacks by terrorists. On the other side of the globe, American forces are deployed
(for example) in South Korea, and even after the end of the Korean War, North
Korean forces have sometimes assaulted American soldiers.

The proposed deployment to Bosnia, therefore, is no innovation. As Commander
in Chief, the President exercises "the power to dispose of troops and equipment
in such manner and on such duties as best to promote the safety of the country."
*Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58,
62 (1941) (Robert H. Jackson, Att'y Gen.). Nevertheless, some have questioned
the President's authority to order the deployment. We first explain why the Presi-
dent has authority under the Constitution to order the deployment. We then review
the War Powers Resolution and suggest that it should be read as reflecting
Congress's understanding that the President, even absent specific statutory
authorization, may deploy military forces abroad and may, in some circumstances,
order them into situations in which conflict may arise.

### A. *The Declaration of War Clause*

The Constitution vests in Congress the power "[t]o declare War." U.S. Const.
art. I, § 8, cl. 11.[3] The scope and limits of that power are not well defined by

---

[3] The Declaration of War Clause is not the only constitutional text relevant to either Congress's or the President's
war powers. As Justice Robert Jackson pointed out, "out of seventeen specific paragraphs of congressional power
[in article I, § 8], eight of them are devoted in whole or in part to specification of powers connected with warfare."
*Johnson v. Eisentrager*, 339 U.S. 763, 788 (1950). The President also has inherent war powers as Chief Executive.
U.S. Const. art. II, § 1, cl. 1, as Commander in Chief, *id.* § 2, cl. 1, and under other clauses.

constitutional text, case law, or statute. Rather, the relationship of Congress's power to declare war and the President's authority as Commander in Chief and Chief Executive has been clarified by 200 years of practice. *See* Harold H. Koh, *The National Security Constitution* 70–71 (1990) (historical precedent serves as "quasi-constitutional custom" in foreign affairs). In ruling on constitutional questions involving foreign relations, the Supreme Court has often shown itself willing to rely on the evolved practice and custom of the political branches. *See, e.g., Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981); *Haig v. Agee*, 453 U.S. 280, 292–93 (1981).

Historical practice supplies numerous cases in which Presidents, acting on the claim of inherent power, have introduced armed forces into situations in which they encountered, or risked encountering, hostilities, but which were not "wars" in either the common meaning or the constitutional sense. As the Supreme Court observed in 1990, "[t]he United States frequently employs Armed Forces outside this country — over 200 times in our history — for the protection of American citizens or national security." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990). In at least 125 instances, the President acted without express authorization from Congress. *See* Leonard C. Meeker, Legal Adviser, Dept. of State, *The Legality of United States Participation in the Defense of Viet-nam*, 54 Dep't St. Bull. 474, 484–85 (1966); *see also Authority of the President to Repel the Attack in Korea*, 23 Dep't St. Bull. 173 (1950). [4] In reliance on this historical practice and understanding, our Office recently took the position that the President had the inherent authority to deploy up to 20,000 troops into Haiti on the invitation of that country's legitimate government. We argued that "[i]n deciding whether prior Congressional authorization for the Haitian deployment was constitutionally necessary, the President was entitled to take into account the anticipated nature, scope, and duration of the planned deployment, and in particular the limited antecedent risk that United States forces would encounter significant armed resistance or suffer or inflict substantial casualties as a result of the deployment." *Deployment of United States Armed Forces into Haiti*, 18 Op. O.L.C. 173, 179 (1994) ("OLC Haiti Letter"). [5]

---

[4] This understanding of Executive power has early antecedents. "[B]oth Secretary [of War] Knox and [President] Washington himself seemed to think this [Commander in Chief] authority extended to offensive operations undertaken in retaliation for Indian atrocities." David P. Currie, *The Constitution in Congress: Substantive Issues in the First Congress, 1789–1791*, 61 U. Chi. L. Rev. 775, 816 (1994). On the other hand, Washington also wrote in 1793 that "no offensive expedition of importance can be undertaken [against the Creek Indians] until after [Congress] shall have deliberated upon the subject, and authorized such a measure." 33 *The Writings of George Washington* 73 (John C. Fitzpatrick ed., 1940).

[5] In fact, past Administrations have made, and acted upon, far broader claims of unilateral Executive authority to order troops into hostile situations than underlay the deployment in Haiti, either as it actually occurred or as it was planned before the military leadership agreed to leave peacefully. For example, President Bush ordered United States troops into Panama in December, 1989, for the purpose (among others) of overthrowing the régime of General Manuel Noriega. President Bush consulted with congressional leaders, but did not seek or receive Congress's authorization. *See* 2 Pub. Papers of George Bush 1722–23 (1990). The boldest claim of Executive authority to wage war without congressional authorization was made at the time of the Korean War—a conflict that ultimately lasted for three years and caused over 142,000 American casualties. Such sweeping claims of inherent Executive authority

Continued

In deciding whether the proposed deployment of ground troops into Bosnia would amount to a "war" in the constitutional sense, considerable weight should be given to the consensual nature and protective purposes of the operation. The deployment is intended to be a limited mission that will ensure stability while the peace agreement is put into effect. Because the mission is in support of an agreement that the warring parties have reached and is at the invitation of those parties, it is reasonably possible that little or no resistance to the deployment will occur. The operation does not aim at the conquest or occupation of territory nor even, as did the planned Haitian intervention, at imposing through military means a change in the character of a political régime. Although combat conceivably may occur during the course of the operation, it is not likely that the United States will find itself involved in extensive or sustained hostilities. Moreover, as the President has made clear, the Allies agree that if there were a total breakdown in compliance, IFOR would be withdrawn.

We believe that the President has ample authority to undertake the planned operation. As noted above, the President as Commander in Chief has "the power to dispose of troops and equipment in such manner and on such duties as best to promote the safety of the country." 40 Op. Att'y Gen. at 62; *cf. Maul v. United States*, 274 U.S. 501, 515–16 (1927) (Brandeis and Holmes, JJ., concurring) (President "may direct any revenue cutter to cruise in any waters in order to perform any duty of the service"). His "authority has long been recognized as extending to the dispatch of armed forces outside of the United States . . . for the purpose of protecting American lives or property *or American interests*." 40 Op. Att'y Gen. at 62 (emphasis added).

The American interests at stake here are clear. The United States has worked closely and intimately with its NATO partners for several years in attempting to carry out United Nations peacekeeping efforts in Bosnia and other parts of the former Yugoslavia.[6] United States military activities in the air and at sea have complemented the UNPROFOR's peacekeeping efforts on the ground. Indeed, the United States has already engaged in combat on several occasions in UNPROFOR's defense. The proposed deployment of a NATO force to implement the peace agreement would be consistent with the pattern of inter-allied cooperation and assistance that has been established over recent years. It would serve significant national security interests, by preserving peace in the region and

---

have been sharply criticized. *See* Louis Fisher, *The Korean War: On What Legal Basis Did Truman Act?*, 140 Cong. Rec. 19,811–16 (1994); *cf. Holtzman v. Schlesinger*, 414 U.S. 1304, 1311–12 (1973) (Marshall, J., sitting as Circuit Justice); *but see* Robert F. Turner, *War and the Forgotten Executive Power Clause of the Constitution: A Review Essay of John Hart Ely's War and Responsibility*, 34 Va. J. Int'l L. 903, 949–59 (1994). It is unnecessary to consider such broad assertions in the present case.

[6] It should also be noted that Congress has expressed its sense that "old threats to the security of the United States and its allies in the North Atlantic Treaty Organization having greatly diminished, and new, more diverse challenges having arisen (*including ethno-religious conflict in Central and Eastern Europe* . . .), NATO's mission must be redefined so that it may respond to such challenges to its members' security even when those challenges emanate from beyond the geographic boundaries of its members' territories." National Defense Authorization Act. FY 1994, Pub. L. No. 103–160, § 1411(b), 107 Stat. 1547, 1827 (1993) (emphasis added).

forestalling the threat of a wider conflict. As the President stated in his November 13 Letter, "[t]his Administration, and that of previous Democratic and Republican Presidents, have been firmly committed to the principle that the security and stability of Europe is of fundamental interest to the United States." November 13 Letter at 1. If the war in the former Yugoslavia resumes, "there is a very real risk that it could spread beyond Bosnia, and involve Europe's new democracies as well as our NATO allies." *Id.* Furthermore, as we explained in concluding that President Bush had authority to deploy United States forces in Somalia, "maintaining the credibility of United Nations Security Council decisions, protecting the security of United Nations and related relief efforts, and ensuring the effectiveness of United Nations peacekeeping operations can be considered a vital national interest." *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 11 (1992). This argument applies equally to a NATO operation that carries out a peace agreement supported by the United Nations. Indeed, there is here the additional consideration that "[f]or almost 50 years, the [NATO] Alliance has been the anchor of America's and Europe's common security," and "[i]f we do not do our part in a NATO mission, we would weaken the Alliance and jeopardize American leadership in Europe." November 13 Letter at 2. Accordingly, in these circumstances, the President would have legal authority to order the deployment, in order to further important national interests.

Several circumstances of the proposed deployment have led some to take a different view of this question. Unlike the Haitian intervention, this operation arguably is not a case where "the risk of sustained military conflict [is] negligible." OLC Haiti Letter, 18 Op. O.L.C. at 173, 176. With the exception of the limited commitment of ground troops to Macedonia, the United States' previous military involvement in the Yugoslav theater has been undertaken only by its naval or aerial forces. The deployment of 20,000 troops *on the ground* is an essentially different, and more problematic, type of intervention: it raises the risk that the United States will incur (and inflict) casualties. Disengagement of ground forces can be far more difficult than the withdrawal of forces deployed for air strikes or naval interdictions. Because of the difficulties of disengaging ground forces from situations of conflict, and the attendant risk that hostilities will escalate, arguably there is a greater need for approval at the outset for the commitment of such troops to such situations; otherwise, Congress may be confronted with circumstances in which the exercise of its power to declare war is effectively foreclosed.

Nevertheless, we do not believe that these arguments against the President's unilateral authority to deploy forces into Bosnia are persuasive. The deployment would be in aid of a peace agreement that will be guaranteed by NATO and the United Nations Security Council. The parties to the agreement already are in substantial, though perhaps not total, compliance with an earlier cease-fire agreement, and have invited the deployment of NATO forces and guaranteed their

safety. To send United States forces to the region, in these circumstances, does not constitute "war" in any sense of the word.[7] Historical practice reinforces the most natural reading of the constitutional language: at the least, the President may deploy United States forces here without express authorization to protect the national interests, even if the deployment is not without some risk.

## B. *The War Powers Resolution*

The War Powers Resolution, Pub. L. No. 93–148, 87 Stat. 555 (1973) ("the WPR" or "the Resolution"), codified at 50 U.S.C. §§ 1541–1548, is intended "to fulfill the intent of the framers of the Constitution of the United States and insure that the collective judgment of both the Congress and the President will apply to the introduction of United States Armed Forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, and to the continued use of such forces in hostilities or in such situations." 50 U.S.C. § 1541(a). To carry out that goal, the Resolution provides that the President is to report to Congress when United States forces are introduced (1) "into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances," (2) "into the territory, airspace or waters of a foreign nation, while equipped for combat" (except for certain specified operations), or (3) "in numbers which substantially enlarge United States Armed Forces equipped for combat already located in a foreign nation." *Id.* § 1543. After a report about the introduction of forces into imminent or actual hostilities, the Resolution would require the President to withdraw those forces within sixty days (or ninety days if military necessity requires), unless Congress has authorized continued operations.

The Resolution necessarily presupposes the President's authority, even in the absence of express authorization by Congress, to deploy troops in circumstances such as those here. Where (as here) the President would be ordering United States forces into foreign territory while equipped for combat, the Resolution requires a report to Congress. The Resolution thus assumes that the President sometimes may order such deployments without prior statutory authorization. Indeed, although section 8(d)(2) of the Resolution provides that the Resolution shall not be construed "as granting any authority to the President with respect to the introduction of United States Armed Forces into hostilities or into situations wherein involvement in hostilities is clearly indicated by the circumstances," 50 U.S.C. § 1547(d)(2), there is no similar reservation against construing the Resolution to authorize deployments of troops equipped for combat in other situations. At the least, even if the Resolution does not add to the President's authority,

---

[7] We do not suggest that *any* deployment of United States troops that could be characterized as defensive or protective would not, for that reason alone, amount to "war." At best, the protective purpose of the planned deployment is but one factor tending to show that our intervention would not amount to "war"; it does not, in itself, establish that conclusion.

it takes for granted that he may make deployments in situations where hostilities are not actual or imminent, without purporting to limit the circumstances in which such deployments may be made, *cf. id.* § 1541(c) (listing circumstances for introducing troops into actual or imminent hostilities), and without placing any restriction on the time during which the deployments may continue.

In our view, the Resolution lends support to the broader conclusion that the President has authority, without specific statutory authorization, to introduce troops into hostilities in a substantial range of circumstances. Although the Resolution asserts that "[t]he constitutional powers of the President as Commander-in-Chief" to introduce armed forces into actual or indicated hostilities are limited to three specific circumstances (*i.e.*, when undertaken pursuant to a declaration of war or specific statutory authorization, or in a national emergency created by an attack on the United States, its territories or its armed forces), *id.* the Resolution also declares that nothing in it "is intended to alter the constitutional authority . . . of the President." *Id.* § 1547(d)(1). The executive branch has traditionally taken the position that the President's power to deploy armed forces into situations of actual or indicated hostilities is not restricted to the three categories specifically marked out by the Resolution. [8] Furthermore, as we have recently argued,

> the structure of the War Powers Resolution ("WPR") recognizes and presupposes the existence of unilateral presidential authority to deploy armed forces 'into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances.' 50 U.S.C. § 1543(a)(1). The WPR requires that, in the absence of a declaration of war, the President must report to Congress within forty-eight hours of introducing armed forces into such circumstances and must terminate the use of United States armed forces within sixty days (or ninety days, if military necessity requires additional time to effect a withdrawal) unless Congress permits otherwise. *Id.* § 1544(b). This structure makes sense only if the President may introduce troops into hostilities or potential hostilities without prior authorization by the Congress: the WPR regulates such action by the President and seeks to set limits to it.

OLC Haiti Letter at 175–76. [9]

---

[8] *See, e.g., Overview of the War Powers Resolution,* 8 Op. O.L.C. 271, 274–75 (1984); *War Powers: A Test of Compliance: Hearings Before the Subcomm. on International Security and Scientific Affairs of the House Comm. on International Relations,* 94th Cong. 90 (1975) (statement of Monroe Leigh, Legal Adviser, Department of State).

[9] We do not understand the Resolution, in itself, to provide statutory authorization for introducing troops into hostilities; section 8(d)(2) of the Resolution itself expressly disclaims any interpretation that it confers such authority. *See* 50 U.S.C. § 1547(d)(2).

## Conclusion

We believe that the President has the authority to order the proposed deployment of United States forces in Bosnia, under the circumstances contemplated, without express statutory authorization.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*