**FLORIDA WILDLIFE FEDERATION et al., Plaintiffs,**

v.

**Neil GOLDSCHMIDT et al., Defendants.**

**No. 80–1398–Civ–WMH.**

United States District Court,
S. D. Florida,
Miami Division.

Jan. 6, 1981.

Daniel G. Lamb, Jr., David G. Burwell, Robert S. Angyal, Washington, D. C., Jack E. Milbery, Hollywood, Fla., for plaintiffs.

Edward B. Galante, Asst. U. S. Atty., Miami, Fla., James Anderson, Tallahassee, Fla., Gerald L. Knight, Harry A. Stewart, Fort Lauderdale, Fla., Fred Bosselman, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

HOEVELER, District Judge.

THIS CAUSE is before the Court on the motion of the plaintiffs, Florida Wildlife Federation, National Wildlife Federation, Environmental Coalition of Broward County, Inc., Broward County Audubon Society and Southwest Ranches Association, for a preliminary injunction to halt construction of a segment of Interstate 75 (I–75) to be constructed from Andytown in Broward County to the Palmetto Expressway in Dade County. Plaintiffs have mounted a multi-pronged attack against the several defendants, United States Department of Transportation (USDOT), Federal Highway Administration (FHWA), Florida Department of Transportation (FDOT) and the United States Army Corps of Engineers (CORPS), all of whom are alleged to have violated various statutes, regulations and Executive Orders in connection with the planning, design and construction of the I–75 segment. Broward County (County), which was not a named defendant, has sought and obtained leave to intervene in this cause to protect its interest in completion of the highway as planned.

On June 10 and 11, 1980, this Court held an emergency hearing on plaintiffs' motion for temporary restraining order, which motion was denied by order dated June 11, 1980. Hearings on plaintiffs' motion for preliminary injunction were conducted on July 10, 11, 21 and 22, at which extensive testimony was received from five witnesses for plaintiffs and six for defendants. Many documentary exhibits, as well as maps, charts and diagrams, were admitted into evidence. The parties waived oral argument at the conclusion of the hearing and filed their written closing arguments on July 25. Based upon the memoranda of law, the testimony and exhibits received and the closing arguments (in memo form) of all counsel, the Court entered an oral ruling denying the motion for preliminary injunction on July 26, 1980. Because of the great public interest attending this lawsuit, the ruling was issued as expeditiously as possible with a written decision, as required by Rule 52(a), Federal Rules of Civil Procedure, to follow.

## I. INTRODUCTION

### A. History of the I–75 Project

The United States Congress established a 41,000 mile interstate system in 1956 for

purposes of national defense and interstate commerce. 23 U.S.C. §§ 101 *et seq.* This enactment included an interstate extension south to Tampa, Florida. In 1968, the Federal Aid Highway Act (Pub.L.No.90–495) authorized the addition of 1,500 miles to the original interstate system. As a result of this Act, I–75 was to be further extended to the Palmetto Expressway in Dade County, Florida.

In 1969 FDOT initiated a series of studies to establish the corridor for I–75 south from its termination point in the Tampa–St. Petersburg Area. A draft environmental impact statement (EIS) for I–75 from Fort Myers in Lee County to Miami in Dade County was completed and circulated by FDOT in 1971. This draft statement included the east-west Alligator Alley, Naples to Andytown segment of I–75 and the north-south, Andytown-Palmetto Expressway segment. However, in 1972 a decision was made by FDOT and FHWA to separate the two segments. The basis of that decision was the fact that the east-west segment across the Everglades and the sensitive Big Cypress Swamp had different characteristics and factors influencing expressway location than the north-south segment through more urbanized areas. This decision was made prior to final location and environmental studies.

At the same time I–75 corridor location studies were going on, FDOT was conducting studies in Broward and Dade County for the development of expressways and parkways which resulted in a final report entitled *The Principal Street and Highway Plan—1985.* Planned facilities that significantly affected the I–75 corridor location were the proposed Port Everglades Parkway, University Parkway, Opa-Locka Expressway and the Le Jeune-Douglas Expressway.

In October, 1972, FDOT hired H. W. Lochner, Inc., to assist in preparation of location and environmental studies for the Andytown to Palmetto Expressway segment of I–75. The study area was bounded by the Florida Turnpike on the east, U. S. Route 27 on the west, State Road 84 on the north and the Palmetto Expressway on the south. Five alternate routes, including a no-interstate alternative, were chosen for study and evaluation. One of the alternative routes was eliminated as a result of further analysis.

Prior to the completion of the draft environmental impact statement for the Andytown to Palmetto Expressway segment, an extensive public participation program was initiated in order to solicit and encourage broad public participation at the I–75 planning stages. Communications were established with community and local governmental officials and agencies as well as civic and environmental groups. A draft environmental impact statement was then completed and submitted to FHWA by FDOT on February 27, 1973. FHWA approved and adopted this draft statement on March 3, 1973.

On April 2, 1973, a corridor location public hearing was held in Broward County to acquaint the public with the results of the draft environmental impact statement. The final Environmental Impact Statement (EIS) for I–75 was submitted by FDOT on June 5, 1973, and approved and adopted by FHWA on June 20, 1973. The EIS was approved by USDOT on September 11, 1973.

Following approval of the EIS, the I–75 project progressed to the design state. Public hearings were held on the proposed design plans in August and December, 1974, by the Broward County Transportation Authority and FDOT. A design public hearing was held on April 21, 1976. The design approval report was submitted to FHWA in August 1976. Final design approval was granted by FHWA on September 6, 1976.

### B. *Present Status of the Project*

As of the date of the most recent hearings, the several segments of the I–75 corridor and its interchanges were in various stages of development, ranging from preliminary planning to actual construction. The first stage, acquisition of the land required for the highway, was substantially completed; all of the right-of-way, except-

ing a few parcels near the State Road 84 (S.R. 84) interchange and adjacent corridor, had already been acquired at a cost of approximately $47,000,000.00. The next stage, preparation of construction plans at the District, or local, level of FDOT, was in process for several segments, with target dates for completion ranging from September 1980 to June 1981. Once completed, the District level plans are forwarded to FDOT in Tallahassee, where the proposed contract is advertised for bids. Several segments, including the S.W. 184th Avenue interchange and the Miramar Parkway interchange, were ready for bidding at the time of the hearing. When the bids are opened and the contract awarded by FDOT, construction may begin. There were three areas where construction had commenced: the interchange at US Route 27 (US 27) and Andytown (target date for completion 1982); the corridor from Andytown to S.W. 190th Avenue, including the interchange at S.W. 196th Avenue (completion date in the fourth quarter of 1980); and the Sheridan Street interchange with its adjacent corridor (completion date in the first quarter of 1982). *See,* COUNTY's Memorandum in Opposition to Motion for Preliminary Injunction, pp. 3–5.

### C. *Issues Presented*

The major issues raised by plaintiffs in support of their motion for preliminary injunction are:

1. The adequacy of the Environmental Impact Statement (EIS) for this segment of Interstate 75.

2. The necessity for a supplemental EIS subsequent to the approval of the original EIS in 1973.

3. An alleged abuse of agency discretion by the Defendants USDOT and FHWA.

4. The adequacy of the procedures utilized by the defendant CORPS OF ENGINEERS in issuing Section 404 (33 U.S.C. § 1344) permits for dredge and fill operations in the wetlands.

5. Alleged violations of Executive Orders 11988 (Floodplains) and 11990 (Wetlands), 42 Fed.Reg. 26,951 and 26,961 (1977), by the federal defendants.

To obtain preliminary injunctive relief on any one of these claims, plaintiffs must show:

1. a substantial likelihood that they will prevail on the merits;

2. a substantial threat that they will suffer irreparable injury if the injunction is not granted;

3. that the threatened injury to them outweighs the threatened harm the injunction may do to defendants; and

4. that granting the preliminary injunction will not disserve the public interest. *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974). A preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion, which burden as to all four of the requirements remains at all times upon the plaintiffs. *Id.,* at 573, 576. The primary justification of such a remedy is to preserve the court's ability to render a meaningful decision on the merits. Thus, only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction. *Id.*

Plaintiffs have argued in this case that their burden is lessened because this is an environmental case and that a showing of violations of the National Environmental Policy Act (NEPA) would, without more, entitle them to a preliminary injunction. Whether or not this is the law of other circuits or other districts (see cases cited at pp. 30–32 of plaintiff's memorandum of law), it is clearly not the law in the Fifth Circuit. *Callaway, supra,* the seminal case in this circuit on preliminary injunctive relief, was itself an environmental case under NEPA; and, as that case makes clear, the usual standards apply and plaintiffs must carry their burden as to each of the elements necessary for a preliminary injunction.

To be sure, preliminary injunctions have often been properly granted in environmental litigation. [citations omitted]. In all such cases, however, preliminary injunctions have been issued not merely because some impact upon the environment has been alleged, but because the threatened harm has been properly shown to be irreparable, in accordance with the usual test for a preliminary injunction. Indeed, where no irreparable injury is alleged and proved, denial of a preliminary injunction is appropriate. [citations omitted].

*Id.* at 574.

\* \* \* \* \* \*

It is quite clear that the NEPA provides a new statutory basis for injunctions against proposed actions by federal agencies that will have significant effects on the human environment if no environmental impact statement has been filed. [citations omitted]. However, the general requirements for a preliminary injunction, even in a suit grounded on the failure to file an impact statement, have not been altered ... Consequently, *the NEPA* though relevant to the merits of the present case, *has not altered the traditional tests for a preliminary injunction* .... [emphasis supplied].

*Id.* at 577–78.

After a review of the evidence presented at the hearings, the Court will examine each of the requirements for a preliminary injunction in light of the facts developed.

## II. *THE ECOLOGY OF THE STUDY AREA*

Plaintiffs' concern with the environmental impact of the highway is less with the highway itself than with the secondary development of the study area, which, it is claimed, will be "induced" by the presence of I–75 through the heart of the study area. Plaintiffs have argued that both the Environmental Impact Statement and the Army Corps' § 404 processes have given insufficient attention to the effect that this induced development will have on the various natural systems of the area—the Biscayne Aquifer, the Everglades, the wetlands and the floodplains. Passing for the moment the question whether plaintiffs have established the cause and effect relationship they assume to exist between the building of the highway and the growth they fear, it is necessary first to examine the testimony regarding the operation of each of these natural systems in some detail in order to understand the potential effects of development on its continued viability.

### A. *The Biscayne Aquifer*

The Biscayne Aquifer is a natural body of earth and rock materials which stores and yields water. It underlies nearly all of South Florida, including all of Broward County, the vast majority of Dade County, and the southern portion of Palm Beach County. Along the coastal areas, the Aquifer extends some two hundred feet below the surface of the soil. As one moves inland from the coast, the Aquifer gradually becomes less thick, feathering out to nonexistence in the far inland areas. (Testimony of Gerald G. Parker, Sr., hydrologist with expertise in ground water).

Rainfall onto the land overlying the Aquifer is virtually the sole source of water coming into the Aquifer. Although some 79 per cent of the water falling as rain is lost to evapotranspiration, recharge to the Aquifer from the remaining rainfall is about one million gallons per day per square mile of surface area. Water entering the Aquifer flows slowly from west to east and eventually into the Atlantic Ocean. (Parker testimony).

The Biscayne Aquifer acts as a natural filtration system to clean and purify the water flowing into and through it. A variety of processes, some chemical and some physical, contribute to the purification systems. The heavy metal pollutants, for example, can combine with limestone particles in the matrix of the Aquifer through an ion exchange process, a chemical reaction which will bind the heavy metals to the rock, thus removing them from the water. Sand within the limestone cavities strains out particulate matter on the same physical

principle as a sieve, allowing dissolved materials to pass through. (Parker testimony). Other purifying systems within the Aquifer include bacterial action (both at the surface, where bacteria feed on and remove nutrients from the water, and deeper in the soil, where different bacteria operate to reduce nitrates and sulphates), adsorption, absorption, dilution and dispersion. (Testimony of William Pitt, hydrologist with expertise in ground and surface water quality).

Because the Biscayne Aquifer is the sole source of drinking water for the three million people living in the South Florida area, there has been, and continues to be, a legitimate concern with the "health" of the Aquifer. Dr. Parker, who first described, named and studied the Biscayne Aquifer in 1946, expressed his concerns both as to the quantity and the quality of water available from the Aquifer. It was his opinion that there may not be enough water available to serve the present population, even without the population increases projected for South Florida. As he conceded, however, the quantity problem is independent of I–75 or its induced development in the study area. It is the presence of people that create the ever-growing demand for water and the possibility of a shortage, whether those people are living in South Miami or in the midst of the study area.

The quality of the water in the Aquifer, as opposed to the quantity available, might be effected in several ways by the construction of Interstate 75 and the accompanying development predicted by plaintiffs around it. Because of the interrelationship between the surface waters above ground and the ground water in the Aquifer, any pollutant in surface waters is a potential threat to the purity of the Aquifer and the drinking supply of South Florida.

Typical pollutants found in storm water run-off (surface waters after a rainstorm which have not yet entered the ground or any canal or lake) in a residential area of a density of three to four units per acre include:

1. nutrients, primarily nitrogen and phosphorus from fertilizers.

2. herbicides and pesticides.

3. gases, oils and other hydrocarbons and heavy metals, such as lead, from driveways and automobiles.

4. coliform bacteria from animal feces. In a commercial or industrial area, the run-off will usually contain more oil, grease and heavy metals and less of the other contaminants, as will run-off directly from a roadway or highway. (Testimony of Susan Uhl Wilson, aquatic biologist with expertise in land use effects on surface waters).

Development may also increase the likelihood of a landfill or sanitary disposal site being placed in the study area. Landfills constitute a special hazard because of the presence of toxic and noxious material which can be leached out of the fill site and into the ground water by rainwater filtering through the substances placed there. (Parker testimony).

Development may necessitate the digging of borrow excavations to obtain fill for construction work. Since a borrow pit "punches a hole" in the covering of the Aquifer and communicates with it, contaminated water flowing into the borrow pit will make its way into the Aquifer. (Parker testimony).

Potential problems which may be caused by I–75 itself, as opposed to the development it might induce, include not only the highway run-off containing lead and other contaminants but also the possibility of spillage from highway accidents as pollution sources. The pollutants from such a hazardous spill could contaminate an area ranging from one hundred feet to a couple of miles away. (Parker testimony).

In addition to adding new pollutants, the highway and its induced development may also reduce the ability of nature's built-in systems for purification to remove the pollutants already present. Draining of the wetted areas cause both oxidation of the muck lands to release additional nutrient pollution and the destruction of the plant covering of the ground which previously acted as a filtration system. (Wilson testimony).

The above outline of potential threats to the Aquifer represents a "worst case" analysis predicated on the assumption that everything which *might* happen *will* happen, with disastrous results for the people of South Florida. While even the possibility of such results is frightening, it must not be forgotten that even plaintiffs' experts conceded the existence of mitigating factors.

First, despite Dr. Parker's concern that the water supply is not sufficient to meet even the needs of the existing population, other witnesses expressed a contrary view. Peter Rhoads, Director of Resource Planning for the South Florida Water Management District (SFWMD), a State agency charged with responsibilities for water quantity and quality from both management and research perspectives, testified that South Florida is a water-rich area from a resource viewpoint, with far more water available than can be utilized. There is more than an adequate supply, not only for current demands, but also for the foreseeable and projected future needs of an increased population until at least the year 2000. Beyond that time, there are other potential sources and techniques which can be tapped to increase the water supply. These include the development of new wellfields, the increased use of Lake Okeechobee and the Conservation Areas as back-ups to the Biscayne Aquifer, the possibility of storage in, and utilization of water from, the Floridan Aquifer (a deeper Aquifer underlying South Florida), and more exotic technologies such as cloud-seeding (Rhoads testimony), desalinization of salt water and water re-use. (Pitt testimony).

In short, the water resources of South Florida are clearly more than ample for the foreseeable future using only existing methods of water management. Even for the more distant future, the problem is not one of resource availability but rather of development of cost-efficient technologies for utilizing these abundant water resources. (Rhoads and Pitt testimony).

Secondly, some of the "pollutants" referred to are not necessarily bad in and of themselves. Nutrients, or fertilizing agents, for example, cause plants to grow, which becomes a problem only when carried to excess. Too much fertilizer causes eutrophication, the overblooming of aquatic plants and algae, resulting in oxygen depletion and the death of fish. (Wilson testimony). The process can occur in canals, making them "scummy" (Wilson testimony), or in larger bodies of water like Lake Okeechobee, where it is to some extent a natural and inevitable stage in the life cycle of a lake. (Pitt testimony). Wilson, a witness called by plaintiffs, testified that this scummy canal syndrome would be the major problem if the study area is developed as planned at three to four residential units per acre. While not particularly aesthetic, scummy canals are hardly a threat to the lives and health of the citizens of Dade and Broward Counties.

Wilson further testified that storm water run-off from the highway itself would be almost insignificant, especially if the highway were properly constructed with safeguards, such as swales, to contain and purify the direct run-off. Another of plaintiffs' witnesses, Gerald Parker, also agreed that direct run-off from the interstate will not be a significant source of contaminants, except as to wellfields near the highway.

A recent study has shown, moreover, that the major roadway pollutant, lead, can be eliminated as a groundwater pollutant by the use of swales adjacent to the road. At thirty meters from the roadside, no detectable amounts of lead are present in the run-off, as the lead has been "captured" by the soils and vegetation in the swale. (Pitt testimony).

Parker's concern with contamination from borrow pit excavations is mitigated by the fact that a borrow pit can pollute the Aquifer only if it is itself polluted. The use of swales and other design criteria mandated by the South Florida Water Management District's Best Management Practices (Defendants' Exhibit 18) will result in less pollution entering the Aquifer through borrow excavations. (Testimony of Peter Rhoads).

Wilson's other major area of concern, aside from scummy canals, should residential development occur in the study area, was that there would be increased pesticide and herbicide pollution. Another of plaintiffs' witnesses, Dr. Parker, testified, however, that pesticide and herbicide pollution are greater in agricultural than in residential areas. This was confirmed by defendants' witness Pitt, who indicated that nutrient pollution from fertilizers, as well as herbicide/pesticide usage, is greater where the land usage is agricultural rather than residential. Since the study area is at present largely agricultural, it would appear that residential development as planned would *decrease*, and not increase, pollution levels for nutrients, herbicides and pesticides.

The United States Geological Survey (USGS) has conducted studies to measure the pollutants levels found in storm water run-off from different types of development. Direct run-off was collected, stored and tested from three different areas in Broward County—a commercial area, a low-density residential area (four to five homes per acre), and an interstate highway intersection. Testing of these samples revealed that no pollutants exceeded the safe drinking water standards established by the Environmental Protection Agency (EPA) with the exception of lead. There was also an aberrant finding of excess chromium in one test out of the 300 or so storms for which samples were collected. (Pitt testimony).

These studies indicate that present storm water run-off in Broward County is not polluted to the extent feared by plaintiffs. Since the test sites were of a similar type and greater density than the development planned for the I-75 study area, it is unlikely that there will be significant pollutant levels found in storm water run-off from the development occurring in the study area.

There is likewise no present pollution of the drinking water supply in Broward County, though nearly all of the existing wellfields pumping from the Aquifer are in highly developed areas of the County in the coastal municipalities. Many of these wellfields are surrounded by intense commercial and industrial developments. (Defendants' Exhibit 2). According to plaintiffs' own experts, these existing wellfields are safe for drinking water (Parker testimony), and even serious pollution problems could be cured by purifying the water (Wilson and Parker testimony).

A recent study done for Broward County by William Pitt identified the best areas in the County for placement of future wellfields, using criteria such as the depth of the Aquifer, the presence of chloride, the existence of nearby landfills and the type of material composing the substrate. (Defendants' Exhibits 19-23). A composite map combining all factors analyzed shows the best areas for wellfields to be east of the I-75 study area in areas already extensively developed. (Defendants' Exhibit 24). Any secondary development in the study area should, therefore, draw its water supply from sources to the east, if new wellfields, are placed in optimum locations. Furthermore, since the existing wellfields, in areas of higher density than will be allowed in the study area, have shown no contamination, there is no reason to assume that any wellfields which might be placed in the study area will become contaminated by surrounding development. (Pitt testimony).

Even as to landfills, which, according to William Pitt, are the worst sources of pollution to the Aquifer, there is little demonstrable threat of contamination of the drinking water supply. Both Parker and Pitt identified one particular landfill site in Dade County as the most dangerous. Pollutants from the landfill have been measured up to one-half mile from the site within the Aquifer. Beyond one-half mile, they are no longer detectable, having been removed by the various purification systems in the Aquifer. Pitt indicated that no landfill in the study area (assuming one is placed there and further assuming that its placement is attributable to the presence of I-75) could spread contamination as far as the

358

Dade County site has done. This is because the Dade site has a transmissivity factor twice that of the study area. Transmissivity is a function of both the permeability and the thickness of the stratum composing the Aquifer in a given area. The study area contains large quantities of sand in the upper layers, giving greater filtration capabilities, while the Dade County landfill site has no sand filtration. Furthermore, since pollutants pose a threat to drinking water only if they reach a wellfield (Pitt testimony), it would appear that any landfill problems in the study area could be avoided by the simple expedient of placing no landfills there or of locating them more than one-half mile from wellfield areas.

A final factor of potential consequence to the Aquifer is the danger of salt water intrusion into the fresh water supply. Because of the canals and other drainage efforts, the water level in the Aquifer has been reduced over a period of many years. Before the development of South Florida, the ground water level was high enough to hold back the salt water from the Atlantic Ocean, but as drainage has gradually lowered the water table, salt water has flowed into the Aquifer along the coast. (Pitt testimony). The area of the Aquifer underlying the coastal ridge has been brackish for many years (Parker testimony), necessitating the abandonment of wellfields in those areas in favor of wells further inland. Two such wellfields have been abandoned, both in Dade County, the first in 1917 and the second in 1941. Beginning in 1941, measures were instituted to check the intrusion by construction of a salinity structure in the canals. Though the process is not entirely reversible, it is presently under control, and in some areas the brackish water has actually receded to the east. Wellfields serving the I–75 area would not be affected by salt water intrusion, as they would be too far inland, (Pitt testimony); and plaintiffs' own witness Gerald Parker admitted the salt water intrusion would not likely increase as a result of I–75.

To summarize the extent of the threat posed to the Biscayne Aquifer and the drinking water supply of South Florida by the construction of I–75 and any attendant secondary development:

1. The quantity of water available from the Aquifer is adequate, using existing technologies, for both present and projected needs through the year 2000. Other sources and technologies are available for development to satisfy further long-term demands.

2. Nutrient, pesticide and herbicide pollutant levels will likely *decrease* if the study areas is developed for low-density residential uses as planned.

3. Some increase in heavy metal, oil and grease pollution is possible from run-off from the highway itself. The degree of this increase is insignificant, however, particularly if proper design criteria are incorporated.

4. Studies in existing areas of commercial, residential and highway development show the direct run-off to be within acceptable limits as to all pollutant parameters except lead, which other studies have shown is captured by swales within thirty meters of the roadside. Development in the study area will not, therefore, result in dangerous levels of contaminants in the storm water run-off.

5. Borrow pit contamination is possible, but its degree can be mitigated by the use of proper design criteria.

6. Possible landfill contamination is mitigated by the type of stratum found in the study area and is controllable by proper location of landfill sites.

7. Even the most serious types of pollutants are eliminated within one-half mile by the natural purification systems of the Aquifer and pose no threat to the safety of our drinking water unless within that distance they reach a wellfield. In the event that a wellfield should become contaminated, the water can be treated to be made safe for drinking.

8. Existing wellfields are not endangered, even though they lie largely within areas more heavily developed than the study area will be.

9. There is no danger of increased salt water intrusion caused by the highway or development around it.

B. *The Everglades*

The Everglades is a wide shallow river, which at one time encompassed nearly all of Southeast Florida up to the coastal ridge. With the coming of civilization to the area, the Everglades has gradually been drained by canals to accommodate man's agricultural, flood-control and development needs. Because of this drainage, the Everglades today, including its Conservation Areas, covers less than one-half the area it formerly occupied. (Testimony of James Hartwell, hydrologist with expertise in surface waters).

The Conservation Areas to the east and north of the Everglades National Park are maintained as water storage and recharge areas in a more or less natural wetted state. More than two-thirds of Broward County and approximately forty percent of Dade County is designated as Conservation Area. The surface area devoted to Conservation Areas in Broward County alone totals more than 800 square miles, and in Dade County it is still more. (Pitt testimony).

Levees on the eastern side of the Conservation Areas, which were completed in 1953, hold back the stored water and separate the Conservation Areas from the drained "remnant Everglades" to the east, including the I–75 study area. The study area is bordered on the west by US 27, immediately adjacent to which lies the levee demarcating Conservation Area 3A. (Rhoads testimony).

Most of the water supply to the Everglades (about 85%) comes from on-site rainfall, with the remaining 15% coming from three canal systems. (Pitt testimony). Rainfall in the study area, excluding that lost to evaporation processes, soaks into the ground to recharge the Aquifer with the excess draining off into the canal systems. The surface water flow in the study area (whether in canals or as sheet-flow over the ground) like the flow of ground water through the Biscayne Aquifer, is from west to east. The major canals in the area, the South New River Canal (designated C–11) and the Snake Creek Canal (C–9), discharge into the Atlantic Ocean. The South New River Canal at its western end has a back-pumping facility (called S–9), which allows for pumping of water against gradient, that is, from east to west, into Everglades Conservation Area 3A. (Hartwell testimony). There is a divide structure (S–13A) in the canal which separates it into east and west segments. Only the water in the western end of the canal can be backpumped. There is also a pump (S–13) at the structure which can forepump to the east, when the canal can carry it. (Rhoads testimony).

Because of this backpumping of water from the western basin of C–11, there is a direct hydrological link between the study area and the Everglades, and pollutants generated in the study area may ultimately find their way into the Everglades. (Testimony of Arthur Marshall, ecologist with expertise in the ecology of the Everglades).

Backpumping of nutrient-laden waters into Lake Okeechobee, a process which began in the early 1900's, has caused the Lake to eutrophy. (Marshall testimony). The process of eutrophication, however, was first detected in 1952. Subsequent studies in 1969 and 1975 have shown the Lake to be in the same relative state of eutrophication as first detected nearly 30 years ago. (Pitt testimony). Moreover, according to Pitt, *all* lakes in South Florida are in some stage of eutrophication, as this is a natural process which begins from the moment of the lake's formation. Even Marshall conceded that backpumping from the study area will have no effect whatsoever on the eutrophication of Lake Okeechobee, as the water will not reach the Lake.

Backpumping has also affected Conservation Area 2A, immediately north of State Road 84 and the study area for I–75. This Conservation Area is maintained as a shallow pond with standing water all year round, unlike Conservation Area 3 to the south and west of S.R. 84. When run-off from agricultural lands containing large quantities of fertilizers is pumped into

standing water bodies, the plant life undergoes enormous bloom. In Conservation Area 2A, a layer of *organic ooze up to one foot thick* has accumulated from the overgrown dead plant materials. This ooze must either be scraped out or oxidized by periodic draining for several months at a time to maintain the health of the system. (Marshall testimony). Water backpumped from the study area, however, does not go into Conservation Area 2A, but rather into 3A, which is not covered by standing water in any event. The South Florida Water Management District is conducting several ongoing studies concerning the water quality in the Conservation Areas and is looking for solutions to the problem in Area 2A. (Rhoads testimony).

In addition to eutrophication processes, the Everglades is suffering from a variety of other ecological ills. Some species of plant and animal life may be endangered because of the changes in the Everglades environment. Entire areas of sawgrass have died. Many of the tree islands have disappeared. The muck layer, a prime indicator of the health of the Everglades, is being eroded at the rate of one inch per year, representing a loss of $250,000.00 per inch in agricultural value. Wetlands vegetation has been displaced by upland vegetation in many areas. All of these processes have been caused by the draining of the Glades, which has reduced the hydro period (the length of time during which the ground is covered by standing water) from its original 8 months per year to 4 months per year at present. The hydro period reduction kills wetlands vegetation and prevents its starting up. Because the muck layer is not protected from oxidation by the long periods of standing water, existing muck is destroyed and accumulation of replacement muck is rendered impossible. (Marshall testimony).

It must be emphasized, however, that these threats to the continued viability of the unique Everglades ecosystem are not attributable to Interstate 75 itself or to any development attendant to it. The damage to the Glades began with the arrival of modern man in South Florida. As early as the 1890's, canals were constructed to drain the land for cultivation. The Everglades Drainage District was set up in the early 1900's and built several of the major existing canals, the St. Lucie, Palm Beach, and Miami Canals, in the 1920's. Various federal agencies began to develop flood management projects in the late 1940's and early 1950's, after a major flood of the area in 1947. (Marshall testimony).

From the point of view of the Everglades, plaintiffs put great emphasis on the fact that "flood control" as a justification for the draining of the Glades is a misnomer. The use of the word "control" contains the implication that standing water or flooding is an abnormal or undesirable condition. Conceding that the presence of standing water is the normal and natural condition of the Everglades necessary for the health of the system, the Court cannot ignore the obvious fact that such a condition is not compatible with human habitation in the area.

Backpumping is likewise not a threat to the Everglades of recent origin. The S-9 backpumping station in the South New River Canal was constructed around 1930 and has been backpumping ever since. (Marshall testimony). Marshall indicated, however, that the construction of I-75 in the study area will increase the level of backpumping. This is because the area will need to be better drained to accommodate development. The water drained off must be backpumped, he believes, because the canals run through highly urbanized areas where land acquisition for enlargement purposes would be prohibitively expensive.

Marshall's opinion is not shared, however, by Mr. Pitt. According to Pitt, it is not necessarily the fact that development in the study area will cause increased run-off and more backpumping. The answer depends on how the development is carried out—if development follows the methods used in the 1950's, there will be increased problems, but if the new requirements of the Best Management Practices are followed, there will be little increase in run-off.

If backpumping should increase and if the water pumped into the Conservation Areas was polluted, it is possible that the water quality standards for water entering the Everglades National Park, as reflected in a memorandum of understanding between the Park Service, the Army Corps of Engineers, and the South Florida Water Management District (SFWMD), might be violated. This agreement set both quantity and quality standards for water to be delivered to the Everglades. The quality criteria set maximum permissible levels for some 36 parameters. Twenty-one of these are pesticides, for which the permissible maximum is zero, that is, no detectable amounts of pesticides are permitted to enter the Everglades. (Marshall testimony).

Both plaintiffs' witness Marshall and defendants' witness Rhoads of the South Florida Water Management District agreed that the water presently coming into the Everglades does not differ from the water historically going into the system. The water is of very good quality, exceeding the standards required by the memorandum of understanding. Although the District has several studies of both quantity and quality factors presently underway, Rhoads does not believe that the water supply of South Florida, and in particular the supply to the Everglades, is threatened by I–75 and any secondary growth it might cause in the study area. The District has, in fact, adopted a formal resolution stating its position that Interstate 75 would not have an adverse effect on water resource management in South Florida and that any associated development is adequately regulated by existing rules and regulations of the District itself and other local government entities. (Rhoads testimony).

Because of the interaction of several factors, the threat to the Everglades from backpumping is extremely attenuated. Since the water is backpumped through only one canal in the study area (C–11), polluted run-off must first reach this canal before backpumping comes into play. C–11 drains only the upper portions of the study area, the lower portion being drained by C–9, which has no backpump. (Rhoads testimony). Development in this lower basin of the study area will, therefore, have no effect on backpumping operations.

For reasons discussed with reference to the Aquifer in Part IIA of this opinion, *supra*, it is not likely that run-off into the canal will be polluted. Storm water run-off studies *supra*, show that run-off from areas developed more intensely than the study area will be is not contaminated in excess of safe drinking water standards, with the exception of the lead parameter, which is controllable to a large degree. Certain pollutants—nutrients, pesticides and herbicides—will probably decrease, rather than increase, if the study area is developed for low-density residential usage from its present agricultural usage. Thus, development in the study area is not likely to result in any significant degree of pollution reaching the South New River Canal, from whence it might be backpumped into the Everglades.

To the extent that run-off is polluted, it is unlikely to do a great deal of harm, since most of the water backpumped through S–9 is not surface water run-off but ground water flowing through the soil and entering the canal through its banks. Development of the study area will, therefore, have little effect on backpumping, since the water being pumped is primarily from the ground and not the surface. (Pitt testimony).

Although there was extensive discussion of existing pollution in Broward County canals, much of this pollution does not appear to constitute any significant hazard. Studies conducted several years ago measured several types of "pollutant" factors in various Broward canals, the major ones being dissolved oxygen and coliform violations.

Minimum dissolved oxygen (DO) levels are necessary to support the biota living in the canal. DO levels below the minimum standard can be caused by many factors independent of pollution of any sort, including the inflow into canals of ground water which has had no contact with the air and, therefore, contains very little oxygen. Dis-

solved oxygen levels also vary with the depth of the canal, the temperature of the water, the time of year (during the dry season, DO levels are lower than in the rainy season), and the time of day (plants produce oxygen during the daylight hours in the process of photosynthesis and consume oxygen at night when photosynthesis stops). (Pitt testimony).

The presence of coliform bacteria in excess of the standards is not a pollutant itself but rather an indicator of pollution and is largely due to the discharge to sewage effluent from treatment plants into the canals. This is a major "point" source of pollution in the eastern ends of the canals which discharge to tide. In the western areas, canal pollution is largely from non-point sources spread over a wider area and not attributable to an identifiable localized discharge site. (Pitt testimony). Since only the western area of one canal has backpumping capabilities, the sewage effluent to the east poses no threat to the Everglades.

Since these studies were performed to identify and quantify pollution problems in the canals, measures have been instituted by Broward County to correct the problems identified. The South Florida Water Management District has also adopted preventive measures, the Best Management Practices, as a result of these studies, which are designed to, and will in fact, according to Pitt and Rhoads, improve the water quality. The Best Management Practices, or 16K–4 Regulations (Defendants' Exhibit 18), include a variety of design criteria, such as on-site water retention to create storage and stop flooding; the use of swales and other vegetated areas to slow down and filter run-off; the use of catchment basins, lagoons and control structures in lakes. (Rhoads testimony). A permit in accordance with the District's regulations must be obtained from the District for any activity within the District, ranging from a road culvert to a major canal, and the requirements are enforced District-wide, that is, basically from Orlando south, including all of Southeastern Florida. (Rhoads testimony).

Further attenuating the backpumping hazard to the Everglades is the fact that C–11 canal does not backpump directly into the Everglades National Park but rather into Conservation Area 3A. The quality of the water presently backpumped through S–9 into the Conservation Area exceeds that required under the agreement for entry into the Park itself. If the water quality should deteriorate, however, the Conservation Area itself has purification mechanisms which remove large amounts of incoming pollutants. Studies have shown, for example, that 96% of the phosphorus, a nutrient component, coming into the Conservation Area is retained there, by plant life or in sediments. Trace metal pollutants are also removed, by a filtration process called the "kidney effect." (Rhoads testimony). Since the water quality agreement pertains only to the inflow point from the Conservation Area to the Everglades National Park, many of the pollutants which might be backpumped from the canal to the Conservation Area would never reach the Glades, having been trapped or removed by the purification processes of the Conservation Area.

The amount of water backpumped into the Conservation Area is extremely small in any event compared with the total volume of water in the Everglades, 85% of which comes from direct rainfall. Of the water which is backpumped, nearly one-half represents seepage replacement, water which has leaked out of the Conservation Area through or under the levee built to contain it. This seepage water has already been into the Conservation Area and escaped; replacing it thus adds no new pollutants to that system. (Pitt testimony).

The Water Management District does, however, have plans to enlarge the backpumping capacity of C–11. At present the canal can deliver only about half as much water as the three pumps at the S–9 station can handle. The canal is, therefore, being enlarged to meet the capacity of the pumps. This enlargement is being done by a private land developer at no cost to the taxpayers

and will have several salutary effects. (Rhoads testimony).

First, the pump presently must draw the water level in C–11 down nearly to sea level to make the water flow to the pump station. This draw-down pulls water from the grounds, which is less pure than surface water. When the canal is enlarged, the pump will not exert as much draw down and pull on impure water, which will result in improved quality of the water being backpumped. (Rhoads testimony).

Secondly, in addition to improved flood control and drainage, backpumping has another purpose wholly unrelated to the desires of developers for more and more land upon which to build and of ordinary citizens for homes not subject to periodic wetting, both of which groups Plaintiffs view as acting counter to the interest of the Everglades. The other function served by backpumping and enhanced by the canal enlargement to make more backpumping possible is that of water storage in the Conservation Areas. (Rhoads testimony). Though Marshall expressed some skepticism as to whether this storage objective is realistic, Rhoads indicated that water "stored" in the Conservation Areas can be released during periods of drought to recharge the Aquifer and to backwash the canals eastward to flush out salt water intrusion.

Backpumping is, therefore, not necessarily an unmitigated evil, but in fact serves legitimate needs and functions. The District has at least six studies presently underway relating to various aspects of backpumping and the Conservation Areas. It is proceeding cautiously and is not prepared to initiate large-scale backpumping efforts until the longrange effects are known.

The plans for increased backpumping, it must be noted, like the existence of some backpumping for the last forty to fifty years, is in no way dependent on the presence or absence of I–75 or of growth in the study area. Backpumping has been occurring from C–11 since around 1931 and will continue to occur irrespective of I–75.

Summarizing the testimony regarding potential effects on the Everglades systems from I–75 and induced growth in the study area:

1. The eutrophication of Lake Okeechobee has not worsened in recent years, and to the extent that the process is a natural one, it would occur eventually even without backpumping of nutrients into the Lake. Lake Okeechobee will not be affected in any event by backpumping from the I–75 study area.

2. The possibility of eutrophication in the Conservation Areas, and indeed its actual occurrence in Area 2A, is increased by backpumping. The study area, however, will not drain into Conservation Area 2A but into Area 3A, which is not covered with standing water. Again, however, the eutrophication process is inevitable. Further, as eutrophication is a function of the nutrient loadings of the water, which are greater with agricultural than with residential land uses, residential development in the study area would not increase, and may actually decrease, eutrophication processes in Area 3A.

3. The general health of the Everglades has been declining ever since modern man decided that South Florida was a place he would like to inhabit. The draining of parts of the Everglades and the resulting changes because of the shortening of the hydro period are, however, irreversible from the coastal areas up to the levees around the Conservation Areas. While "flooding" the study area and most of South Florida to restore the area to its original Everglades state would probably be beneficial to the health of the Glades, it would be disastrous for the millions of people already living on land that was once part of the Everglades.

4. Backpumping is an extremely remote threat to the quality of water entering the Everglades. The danger is predicated on the existence of a series of assumptions, some of which clearly are unwarranted and all of which are at best debatable.

(a) Since the water presently going to the Conservation Area from S–9 exceeds the water quality required even for the Everglades National Park, the development

"induced" by I–75 in the study area must somehow drastically raise pollutant levels over those presently existing from the development already present in the study area.

(b) Run-off from the study area must be polluted far in excess of run-off from the usual residential, commercial and highway areas in Broward County. Studies from more heavily developed areas of Broward have shown run-off testing within acceptable limits for all factors except lead, and this one factor is largely manageable. The use of the Best Management Practices will further reduce the likelihood of significant contamination levels in the run-off.

(c) Contaminated run-off from the I–75 development must reach, by ground or surface flow, the one canal in the area that can backpump at its western end. A significant portion of the study area is drained by another canal without a backpump so that development in that part of the area will have no effect on the quality of water backpumped through C–11.

(d) Polluted water backpumped into the Conservation Area must proceed directly to Everglades National Park in such a fashion that the natural purification systems in the Conservation Areas are rendered ineffective to reduce pollutant levels.

5. Backpumping will likely continue, and perhaps increase, regardless of whether I–75 is constructed. There are legitimate reasons, apart from development needs, that justify backpumping; and the Water Management District is taking great pains to insure that the process results in no environmental damage to the Conservation Areas or the Everglades.

### C. Wetlands

Since the study area was formerly a part of the Everglades, it is classified, at least in part, as wetlands. Because of the draining of this area, it is now low-grade "stressed" wetlands in the process of becoming uplands. (Testimony of Wilson, Parker and Rhoads). Other parts of the study area not classified as wetlands at all.

Wetlands are part of the "waters of the United States," and are, therefore, subject to the strictures of the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. § 1251 et seq. Section 404 of the Act (33 U.S.C. § 1344) establishes a permit program administered by the Secretary of the Army Corps, to regulate the discharge of dredge and fill materials into waters of the United States, including wetlands. That portion of Interstate 75 which requires wetlands permits encompasses 7.25 miles of the 23 mile segment in issue in this case, between N. W. 170th Street and Sheridan Street, including some land that is no longer wetlands. (Defendants', except Broward County, memorandum of law, p. 27).

Wetlands in their natural and productive state perform purification operations by filtration of contaminants in water coming into them through the wetlands vegetation. True wetlands are, therefore, environmentally sensitive and must be protected from degradation. (Wilson testimony). The wetlands in the study area, however, have already been degraded by drainage and are no longer healthy and productive. (Wilson, Parker and Rhoads testimony). These wetlands have become stressed because of the deprivation of water needed to maintain their health. The gradual reduction of the hydro period has resulted in the displacement of wetlands vegetation by uplands vegetation in many areas. This reduction has occurred over a long period of time as the drainage of former Everglades lands has proceeded, so that the hydro period now lasts, instead of eight months per year, only about four months per year. (Marshall testimony).

According to Rhoads, the wetlands in the study area were doomed to degradation when the levees demarcating the Conservation Areas were completed in 1953. While it is possible to restore the study area wetlands to a productive state, restoration could be accomplished only by removing the levee and flooding the area. Since most of the land in the study area is owned by private interests, who would most likely object vociferously to such a procedure,

flooding is not a reasonable nor likely possibility. The District has from time to time, however, reversed the process of degradation on a small scale by requiring developers to set aside an area of wetlands within a site to be developed for preservation in a more or less natural state. (Rhoads testimony).

Some further loss of wetlands will result from the construction of I–75 and from any attendant development in the study area. All the experts agree, however, that these wetlands are already degraded because of drainage unrelated to the highway. Thus the loss is, from an environmental standpoint, not significant, and from a practical viewpoint, irreversible whether or not I–75 is constructed.

### D. Floodplains

Much of the area surrounding the proposed I–75 route has been designated as within the 100-year floodplain by the Department of Housing and Urban Development under the Flood Insurance Act, 42 U.S.C. § 4101(a). In fact, nearly all of Dade and Broward Counties is within the floodplain. (Defendants', except Broward County, memorandum of law, p. 43). For that reason, no alternative road or site, including US 27, would escape the floodplain designation. (Id., p. 44).

Because the I–75 study area is within the low-lying floodplain, it is a flood-prone area. The likelihood of flooding in the area was increased by sloppy development practices followed in the past. Development occurring in the 1950's, 1960's and early 1970's was done with inadequate fill criteria. While elevations for earlier development were too low, both Broward County and the Water Management District now require higher fill for any further development in the study area, thus rendering flooding less likely than previously. (Rhoads testimony).

Though plaintiffs expressed concern that putting in more fill in the study area would raise the floodlevel, resulting in flooding of existing homes and other development in the area, the testimony demonstrates that this result is unlikely. Obviously if the *entire* study area were built up with fill by any given number of feet above the existing surface, the floodlevel for the area would be raised by the same number of feet because of displacement principles. Rhoads testified, however, that the fill criteria would not result in raising the entire surface of the study area. Only certain areas where development is actually placed would be built up, with corresponding areas required to be excavated or lowered. This balancing process maintains a proper ration of fill height to water storage capacity of the lower lying areas, so that the buildings themselves are located on "islands" in the basin, which are surrounded by "lakes" with a water storage capacity up to the 100-year flood level. (Rhoads testimony). Because the County and the District regulations require that the inflow to outflow ration remain the same after development as it was prior to development, there will be no significant change in floodlevels resulting from development in the study area. (Pitt testimony). According to both Rhoads and Pitt, therefore, the increased fill for development in the study area will not result in flooding of the existing development.

There is a further reason why development in the study area will not raise the flood level, that is, the enlargement of the South New River Canal (C–11). This enlargement will improve the drainage in the entire canal basin because the pump capacity at S–9 will be more fully utilized. The improved drainage will lower the floodlevel for the entire basin, benefitting existing, as well as new, development. (Rhoads testimony).

The evidence, therefore, indicates that the floodplain levels will not be significantly affected by I–75 or by any attendant development it might cause in the study area.

### III. WILL INTERSTATE 75 INDUCE DEVELOPMENT?

The crux of plaintiffs' case is that the construction of Interstate 75 in the study area will induce massive residential, com-

mercial and industrial development of that area. It is this induced secondary growth, and not the highway itself, which plaintiffs fear will result in harm to the Aquifer, the Everglades, the wetlands and the flood-plain. For purposes of discussing the potential environmental effects of the interstate in Part II, *supra*, it was assumed that the highway would cause such development. It is now necessary to examine whether this assumed causal relationship has, in fact, been demonstrated by the evidence. On this issue, the experts differ sharply.

Plaintiff's witnesses were virtually unanimous in their opinions that I–75 will indeed cause secondary growth in the study area. (Testimony of Parker, Marshall and Robert L. Morris). The expertise of two of these witnesses, Parker and Marshall, lies in other sciences, however; thus their opinions on this issue are entitled to less weight than those of witnesses whose primary specialty is in development-oriented areas. Plaintiffs' only witness with such expertise was Robert L. Morris, a traffic engineer and transportation planner.

Morris explained that there is a direct relationship between transportation facilities and development. "Induced" growth is development which results directly from increased accessibility to means of transportation. The construction of a roadway always causes more growth in the area surrounding it, assuming there is a market demand for development. The availability of transportation affects both the timing and intensity of development in an area, accelerating the timing and increasing the intensity. It also effects the total volume of travel within the area, since the presence of a roadway insures that more trips will be made than would have been made absent the road.

It was Morris' opinion that these general rules would apply specifically to I–75, that is, that construction of I–75 would induce growth along the corridor and that the growth would occur sooner and with a greater intensity than if I–75 were not constructed. Morris mentioned three possible methods for controlling this induced growth. The first method, limiting the number of highway interchanges, would reduce growth by limiting accessibility to the highway. The second method, land use planning to limit the type and density of development, would not, he asserted, be an effective means of control because of its vulnerability to political pressures. The third method, limiting the means of transportation severely so that existing roadways become congested, utilizes the congestion itself as a factor to limit growth possibilities.

Morris conceded, however, that he has never been into the study area itself and that his only familiarity with the development already in existence there comes from his review of the Environmental Impact Statement (EIS), which is now more than seven years old, and of photographs of the area. He indicated neither knowledge of the present traffic volumes in the area nor of the County's plans to build other roadways there, as reflected in the Principal Street and Highway Plan of 1985.

Arrayed against Morris and his limited knowledge of the particular highway and area at issue in this case are several witnesses for Defendants, each of whom has concrete familiarity and involvement with the specific problems and needs of this area of Broward County.

James Nicholas, a land economist with expertise in environmental and urban studies, has done several local studies over the past decade. Nicholas traced the history and causes of development in South Florida, primary among which is the migration of people and businesses into the area from both domestic and international sources. South Florida has been and remains in a growth phase, with approximately one million new people projected for Dade and Broward Counties within the next twenty years. These one million new residents will require some 350,000 new jobs and dwelling units.

The pattern of development in South Florida has been along the coastal areas first, with the spread of development between coastal cities so that the entire coastal ridge is now fully developed. The inter-

city coastal areas were easily developed, the land being high and transportation facilities already existing there. As these areas became filled, development began to move westward. Two major factors affect the location of the westward push for development—proximity to a metropolitan center and ability of the land infrastructure to accept growth. Thus, the first areas to develop west of the coastal ridge were those closest to existing cities where the land was higher and easier to prepare for development. (Nicholas testimony).

The I–75 study area is the next logical growth area both because of its central proximity to the metropolitan areas of Dade and Broward Counties and because there are few suitable alternative undeveloped areas remaining. The westward push of development already borders the environmentally sensitive East Everglades in certain parts of South Dade County and the Conservation Areas in parts of Palm Beach and north Broward Counties. Moreover, the development of the study area will occur regardless of I–75. Development there is planned, zoned and in progress under the County's Land Use Plan, and the Plan alone will cause development of the study area with or without I–75. (Nicholas testimony).

What I–75 will do is to provide a focus for the inevitable development of the area. It will link Dade and Broward Counties and will interconnect with other major transportation arteries, e. g., the planned Sawgrass and Everglades Expressways. The development will be primarily residential in character and the homes will be occupied by workers rather than retirees because of the access the highway will provide to Dade County's job markets. There will be industrial development where I–75 connects with other major arterials and around its interchanges. Light industries, such as electronics assembly or metal fabrication, and service industries with no physical product, such as communications, will predominate. There will also be some commercial development, such as grocery stores and shopping centers, wherever there is residential development. (Nicholas testimony).

If I–75 is not constructed in the study area, there will be a difference in the type of growth occurring but little difference in the amount of growth. Instead of primary homes (those occupied by workers), residential development will include more retiree homes because of the lack of efficient access to job opportunities in Dade County. The number of homes per acre, whether occupied by workers or by retirees, will remain constant, with or without I–75, at 1.1 to 2.5 units per acre. The amount of commercial development to support those residences will likewise remain constant, though the type of goods sold may vary with the type of residents living nearby. The elimination of I–75 as a transportation focus will, however, reduce the amount of industrial development planned for intersections and interchanges. Since these industrial areas designed into the Plan are necessary to provide jobs for an ever-increasing population, eliminating I–75 would mean the loss of thousands of employment opportunities in west Broward. (Nicholas testimony).

Another witness for Defendants, Joel Volinski, Director of the Planning Section, Broward County Planning Council, testified regarding the Broward County Land Use Plan, adopted in 1977, pursuant to the Broward County Charter passed by the voters in 1974. The Plan represents a county-wide approach to development and has the full force and effect of law throughout the County. It was developed over a period of three years, after some 30 or more public hearings and extensive studies. Each local government entity within the County must conform its own zoning regulations to the requirements of the Plan; and while a city may adopt more rigorous requirements than mandated by the Plan, it may not be more lenient than the Plan allows without seeking an amendment to the Plan.

The Land Use Plan consists of some 275 pages of text, plus maps and amendments made to the Plan. The procedures for adopting amendments to the Plan are stringent and require some six to nine months to complete. A city that wishes to obtain an

amendment must conduct a public hearing and make a recommendation to the Broward County Planning Council. The Council next conducts two additional public hearings and makes its recommendation to the County Commission. The Commissioners then hold one or two more public hearings and may ultimately approve or disapprove the requested amendment. Since the adoption of the Plan in 1977, there have been amendments to the Plan in the I–75 study area on four separate occasions. The net effect of these amendments has been to *reduce* the number of residences allowed in the study area by over 12,000 or approximately half the number originally allotted. (Volinski testimony).

The maximum density permitted under the Plan for the area surrounding I–75 is 2.5 units per acre. This is one of the least densely developed areas in the County, the coastal areas having a maximum density of 31.6 units per acre with density decreasing with distance inland from the coast. (Volinski testimony).

Contrary to Morris's statements, Volinski does not believe that I–75 will induce development in the study area. First, there is already some development there and other development is planned, committed and in process irrespective of I–75. All of this development is in accordance with the Land Use Plan, except for areas that were developed prior to the existence of the Plan. Second, the Plan was adopted on the assumption that I–75 would be built as planned. Landowners and developers in the area have known of the highway for several years, and thus have no basis for seeking amendments to the Plan on the grounds of change in conditions after completion of the highway.

The basic premise of plaintiffs' argument, that access to transportation induces development, is itself debatable in its application to South Florida. There are several large developments throughout the area which have sprung up in the far western reaches of Dade, Broward and Palm Beach Counties despite the lack of adequate transportation to those areas to the time of their development. As examples, Wellington in Palm Beach County is 10.0 miles and 17 minutes from a major expressway. Bonaventure, in the I–75 study area, is 12.6 miles and 25 minutes from the nearest major highway, the Florida Turnpike. Other communities and their travel times are shown in Defendants' Exhibits 13 and 14. Each of these western communities began in 1970 or earlier, and each was developed independently of existing transportation access. Many of them lack even today a major road or highway to serve their residents. (Volinski and Nicholas testimony). The existence of these communities demonstrates vividly that even without access to adequate transportation, development in South Florida will occur because of the tremendous demands created by a growing population. (Nicholas testimony).

Because of these communities and other existing development in western Broward and Dade Counties, there is a present critical need for a major roadway in the study area. If I–75 is not constructed, the already dangerously overcrowded roads in the area will become yet more crowded, and an alternative eight-lane road would have to be constructed to replace the interstate. (Testimony of Arnold Ramos, transportation engineer).

In short, Plaintiffs' fears that I–75 will induce massive, total development of the study area have little evidentiary support. Though it may be true as a general rule that access to transportation causes development, the history of and projected increases in population growth for South Florida demonstrate that growth will occur because of market demands even when transportation is lacking. There is already some development in the study area, and development will continue there as planned and allowed under Broward County's Land Use Plan, whether or not I–75 is constructed, because it is the next logical area for development. This development pursuant to the Plan will not be the "total" development Plaintiffs fear but will, in fact, be one of the lowest density areas in the County. Though Plaintiffs distrust the political

processes, all the evidence indicates that the Land Use Plan is, and will continue to be, enforced. Balanced against Morris's opinion that land use plans are ineffective to control development is the fact that the only amendments to Broward County's Plan which affect the study area have sharply decreased, rather than increased, the overall development allowed. Speculation, conjecture and fear that the highway will cause development and that the development will harm the resources of this area are insufficient grounds upon which to grant a preliminary injunction.

## IV. *IRREPARABLE INJURY*

### A. *Harm to the environment*

█ The environmental harms that Plaintiffs have contended will result from the construction of Interstate 75 are, as discussed above, extremely speculative, both in logical connexity and in space of time.

First, because Plaintiffs have not demonstrated that I–75 will induce excessive development in the study area, there is no demonstrated proximate cause between the activities attacked and the harm feared, requiring the action that Plaintiffs implore the Court to take. Halting construction of I–75 would not stop the development of the study area—development will continue to proceed, with or without the expressway, in accordance with the County's Land Use Plan, as it has in the past.

Second, assuming *arguendo* that I–75 will cause the feared development of the area (though the Court has expressly found otherwise), development will not result in the devastating environmental consequences that Plaintiffs have postulated. The Court appreciates fully the sincere concern of Plaintiffs' counsel and their witnesses as to the past and asserted future damage to the natural resources of South Florida. Indeed, all citizens of Dade and Broward Counties should be vitally interested in safeguarding our drinking water and in protecting and enhancing the unique life systems of the Everglades and wetlands. Much damage to the health of these systems has already

occurred and will undoubtedly persist into the future. Perhaps such damage is inevitable whenever man comes upon the scene to "improve" and "develop" the lands upon which he chooses to live. This lawsuit, while serving the important function of bringing such issues to the forefront of public attention, should not be resolved by the ritual incantation of anti-development philosophies. There are many who share the conviction that "development" is a dirty word, an evil and menacing threat to the very existence of non-human life on this planet and indeed to the planet itself. Many of them believe that those of us fortunate enough to reside at present in this country and in this area of South Florida must close our doors, our lands, and our resources to protect what we have against newcomers who ask only for the chance to be included in the wealth of our blessings. The problems of serving the needs of growing numbers of people with dwindling quantities of both public and private resources and of balancing the needs of man against the vulnerabilities of nature to destruction at his hand defy resolution with simplistic formulas and are likely to intensify in the future. Such issues, however, are well beyond the scope of these proceedings and the power of this Court to resolve.

The Court can decide only the specific questions before it and that decision must be grounded in the evidence and the law presented. On the basis of that evidence, and after full and reasoned consideration of all the factors developed, it is clear to this Court that the environmental consequences of development in the study area have not been shown to be significant. The environmental concerns are real, the dangers not fully known, and the possibilities, however remote, are frightening enough; but the development of the study area has not been shown to be causally related to these concerns, dangers and possibilities.

Absent evidence of a significant causal nexus between the construction of I–75 and the development of the study area and between the development and environmental damage, there is no factual basis upon

which to order the highway stopped. Plaintiffs have simply failed to demonstrate that the highway, as opposed to other factors in the past, present and future course of events in South Florida, will cause them injury.

Third, even if plaintiffs had proven to a certainty that I–75 would induce massive secondary growth in the study area, and that such growth would inexorably result in environmental disaster, the process of building a highway and of developing the area cannot be accomplished overnight. Two of the sections of the interstate upon which construction has already begun will not be completed until 1982 at the earliest. Since other sections will not even be ready for bidding until 1981, it is safe to assume that the highway could not conceivably be finished until at least 1983. Upon completion of the highway, it would require several months, if not years, for the surrounding area to become completely developed. Surely, by that time, even with the congested dockets of this District, a trial on the merits would be concluded. Since only those injuries which cannot be redressed by the application of a judicial remedy after a hearing on the merits warrant the drastic and extraordinary remedy of a preliminary injunction, *Callaway, supra,* Plaintiffs would not be entitled to an injunction now against events which will occur, if at all, so far distant into the future that a full trial could be conducted before they came to pass.

Plaintiffs have shown at best a remote threat some years away that the highway *might* cause development, which development in turn *might* result in harm to the environment. The proof falls far short of the substantial threat of irreparable injury necessary to justify a preliminary injunction.

B. *Commitment of resources*

In addition to the threatened harm to the environment, Plaintiffs have asserted an entirely different type of irreparable injury. They argue that continuation of the I–75 project will result in a further irretrievable commitment of financial resources to this project. This commitment of funds will have two effects, according to plaintiffs: (1) the further that construction has progressed, the less likely it is that the Court will grant them relief; and (2) even if granted, relief may be meaningless because agencies which have invested substantial time and money in a project are unlikely to abandon it when ordered to re-evaluate its environmental effects.

In so far as this Court is concerned, Plaintiffs are advised (if such advice is necessary) that the undersigned will grant injunctive relief, preliminary or permanent, if and when they have satisfied the legal prerequisites for such relief. When Plaintiffs raised this question at the first hearing in this matter, all parties were advised that further commitment of resources and further construction of the highway from that date forward would not affect the Court's decision, if at some future date it were determined that the highway should not be built.

The second alleged effect of continuing construction, an agency's supposed inability to be objective about a project once funding has been committed, requires the Court to assume that the federal and state agencies involved will abdicate their legal responsibilities. Though Plaintiffs are apparently eager to make such an assumption, the Court has more than a little difficulty ascribing to Defendants such bad faith and utter disregard of duty, particularly in the absence of even a shred of evidentiary support for such an assumption. The evidence, in fact, leads to the opposite conclusion— that Defendants have shown themselves willing to re-evaluate the project when circumstances justify a second look. For example, Defendants Federal Highway Administration (FHWA) and Florida Department of Transportation (FDOT) entered into a memorandum of agreement with the Environmental Protection Agency (EPA), after this lawsuit was filed and before the preliminary injunction hearings. Under this agreement, Defendants will further evaluate the effects on the Biscayne Aqui-

fer from three of the proposed interchanges and the growth that might occur. Pending this re-evaluation, work on these three interchanges will be deferred. This re-evaluation resulted from EPA's concerns, expressed in a letter from the Regional Administrator dated May 23, 1980, wherein EPA concluded that I–75 itself would have no adverse impact on the Biscayne Aquifer but that the *indirect* effects of the highway (through long term residential and industrial development of the area) were to a large extent undetermined and *may* have an adverse impact on the Aquifer. Because of this possibility, EPA sought a re-evaluation of the number and location of the interchanges, to which FHWA and FDOT have agreed.

There is, therefore, no basis for assuming that any further commitment of resources which might occur prior to trial on the merits will cause Plaintiffs any irreparable injury.

## V. *BALANCING THE HARMS*

The injury claimed by Plaintiffs has been discussed at length above. These claims must be balanced against the harm to defendants, which could result from the granting of the injunction. The primary harm to defendants is monetary loss from construction delays and increased costs later. The loss to the Defendants is on the order of $40,000 per day for delay damages in construction contract penalties alone. There would be additional recurring start-up costs if the contractors were required to remove their equipment from the job site and return it later, if and when construction resumed. Further, the overall cost of the project is likely to increase significantly because of inflation if the highway is delayed beyond its present schedule. Finally, delay may jeopardize the entire project because of the dwindling availability of federal funds for highway construction.

Though monetary loss is generally not deemed an irreparable injury because of the availability of money damages to recompense the loss if Defendants should later prevail on the merits, the magnitude of the financial injury in this case, coupled with the fact that Plaintiffs are unable to post more than a nominal bond if a preliminary injunction were issued, means that the losses Defendants would suffer would for all practical purposes be irreparable. Bearing in mind that these are not the dollars of a private individual or corporation but those of the taxpayers and citizens which would be forever lost, Plaintiffs' argument that even substantial additional costs caused by court-ordered delay are entitled to little weight in the balance is specious at best.

Apart from the future financial losses which would result from a preliminary injunction, there are monumental sums of money which have *already* been expended by Defendants on the I–75 project. As of February 1980, Florida DOT had spent some $47 million for right-of-way acquisitions for the Andytown to Palmetto segment of I–75. An additional $7.3 million had been spent for preliminary engineering, including the preparation of the EIS. A further $53.7 million was committed to construction contracts already spent or awarded. (Testimony of James E. Fuller, Right-of-Way Administrator for FDOT). As these figures represented the amounts spent some five months prior to the hearing and did not include at least one contract which was subsequently awarded, the sum actually expended or committed by the date of the hearing totals approximately $112 million.

In a later memorandum, Plaintiffs have argued that the $112 million commitment is largely illusory because part of it would be recoverable even if the highway was not built (e. g., by selling the land acquired for the right-of-way) and because other portions are not truly "committed" at this point in time. Reducing the $112 million by these amounts, Plaintiffs contend that the *only* amounts actually at stake which might be lost by Defendants if the injunction issued total approximately $15 million. While Plaintiffs may view this sum as lacking significance, the Court must disagree, particularly in light of Plaintiffs' inability to respond in damages to anything but an insignificant per cent of that total.

Even if Plaintiffs had met their burden as to all of the requirements for preliminary injunctive relief (though it will be seen that this is true of none of the four prerequisites), the above commitments already incurred by Defendants militate strongly against Plaintiffs' right to relief at this point. Defendants have argued that the seven-year delay between the approval of the EIS and the filing of this lawsuit challenging its adequacy, together with the substantial prejudice suffered by Defendant in the form of the massive expenditures above discussed, constitutes laches as a matter of law, barring Plaintiffs' claims against the EIS.

The Fifth Circuit has discussed the application of the equitable doctrine of laches in the context of environmental litigation in the case of *Save Our Wetlands v. US Army Corps of Engineers*, 549 F.2d 1021 (5th Cir. 1977). Three criteria must exist for the doctrine to apply:

1. a delay in asserting a right or claim;

2. that the delay was not excusable; and

3. that there was undue prejudice to the party against whom the claim is asserted.

In the case at bar, Plaintiffs waited some seven years after the EIS had been finally approved to challenge its sufficiency in this action. During that interim, Defendants expended considerable monies and resources to carry out the plans approved in the EIS. Thus, it would appear, at least *prima facie*, that the first and third requirements for the application of laches are present.

While the Court need not decide at this juncture whether laches applies to bar Plaintiffs' claims regarding the EIS, the delay and the resulting damage to Defendants are clearly factors that may be properly considered in the balancing of the equities. The interstate has been planned since 1969, and the planning has not been done in secret, as discussed in Part IA, *supra*. Plaintiffs have not been completely idle during the planning stages and indeed appear to have voiced objections to the project at several public hearings and to various agencies. The fact remains, however, that Plaintiffs knew that the highway was proceeding despite their objections and did not seek judicial relief until construction had already commenced in three separate areas. It is difficult to see how a problem that Plaintiffs have been content to let fester without judicial intervention for at least seven years has suddenly become converted to an emergency justifying the drastic and extraordinary remedy of preliminary injunctive relief. If the EIS is inadequate, it was inadequate from its inception in 1973. If plaintiffs wished to challenge it, the legal remedy was available in 1973—and in 1974, 1975, 1976 and so forth. The relatively short space of time before a trial on the merits can be concluded, in comparison with the seven or more years that have elapsed during which Plaintiffs themselves saw fit not to seek a court order to protect their rights, does not justify this Court's intervention now.

Granting a preliminary injunction would favor the tenuous and conjectural injuries Plaintiffs assert over the specific, concrete certain and irreparable harm that will follow to Defendants if construction is halted. In view of the facts that Plaintiffs have waited seven years to come to this Court and that they are, in all probability, financially unable to recompense Defendants and the public for even one day's worth of delay damages, the equities are weighted heavily on the side of the Defendants. Thus, Plaintiffs have failed to carry their burden on the requirement that the threatened injury to them outweighs the threat of injury to Defendants if the injunction is granted.

## VI. *THE PUBLIC INTEREST*

One of the prerequisites for preliminary injunctive relief is a showing that granting the injunction will not disserve the public interest.

The public has several interests at stake in this controversy. Plaintiffs have aligned themselves with the "strong public interest embodied in the NEPA concerning the importance of agency consideration of environmental values." *Environmental De-*

*fense Fund v. Tennessee Valley Authority,* 468 F.2d 1164, 1182 (6th Cir. 1972). While the existence of such a public interest is beyond question, it does not necessarily follow that Plaintiffs' position is the only one through which that interest can be vindicated. If the mandates of NEPA have already been satisfied by Defendants' preparation and approval of a legally sufficient EIS, then these rights and interests of the public require no further exposition by Plaintiffs and justify no drastic intervention by this Court. Since the Court has concluded in Part VII, *infra,* that Plaintiffs have not shown the EIS to be legally inadequate, this public interest does not militate in favor of granting the requested injunction.

In addition to the public's interest in the protection of environmental values, there are at least two other public interests at issue on this motion for preliminary injunction. The first of these is the public's interest in protecting its pocketbook. As noted in Part V, *supra,* the I–75 project has cost at least $15 million to date even by Plaintiffs' own estimate and upwards of $112 million using Defendants' figures. Damages caused by delay of construction if an injunction were issued would amount to at least $40,000 per day. Since Plaintiffs cannot protect Defendants against this loss during the pendency of a preliminary injunction, the damage cannot be recouped and the public will have wasted several million dollars in tax revenues which might have been expended more productively elsewhere.

Perhaps more important than the fiscal loss the public would sustain is the danger of increased traffic congestion resulting from either a temporary or permanent abandonment of the interstate. It appears from the evidence that the public badly needs a highway in the study area or slightly to the east of the study area. No highway can be placed in the area east of the corridor, however, because that area is already highly urbanized. Flamingo Road, the major thoroughfare in the study area, is dangerously overloaded at present. Some 19,000 vehicles per day must use this narrow, two-lane road bordered on one side by a deep canal. Because it is not as wide as an average two-lane road and because of the canal hazard, the capacity of Flamingo Road is less than the 10,000 vehicles per day capacity for most two-lane roadways. Flamingo Road is, therefore, at approximately twice its maximum safe capacity today, and by the year 2000 the traffic count is expected to climb to 70,000 to 90,000 vehicles per day. (Ramos testimony).

The deletion of I–75 through the study area would put even more pressure on the already inadequate local roads. All the existing roads would have to be enlarged and even with the enlargement would be insufficient to carry the traffic. Moreover, according to Ramos, there are no funds available to the County or the State to begin even the design phase of improvements to these roads within the next five years. If all the local roads could be upgraded, there would still be a need for a major expressway in the study area. The present traffic situation, which is little short of critical, will deteriorate still further in the future. (Ramos testimony). Thus, every day that the highway is delayed only adds to the inconvenience and danger of local travel in this area of the County.

Apart from servicing the local traffic of the area, the highway, as part of the interstate system, will become an integral portion of our national defense system and may be necessary for the evacuation of South Florida in the event of natural disaster or war. (Ramos testimony). Because an interstate furthers these national objectives, the federal government participates with the states in the funding of interstate highways on a 90 to 10 ratio. The federal participation in the project may be endangered by delays, as there is only a limited pool of federal revenues from which all interstate highways across the nation must be funded. There is little question but that without this federal funding of 90 percent of the costs, neither the State nor the local governments could afford to build the highway. Thus, inordinate delay could result in the complete abandonment of a sorely needed project.

The public interest would be grossly disserved by depriving the residents and taxpayers not only of their tax dollars but also of their access to safe, efficient means of both routine local travel and emergency evacuation. Plaintiffs have failed to carry their burden on the public interest test prerequisite for preliminary injunctive relief.

## VII. LIKELIHOOD OF SUCCESS ON THE MERITS

The Court has already found that Plaintiffs have failed to carry their burden on three of the four prerequisites to a preliminary injunction. A negative finding on any one of the four would be sufficient basis for denying them relief, but because of the complexity of this case, the publicity it has received, and the time and effort all counsel have devoted both to the hearing itself and to the preparation of extensive briefs, the Court deems it important to discuss as many of the issues raised as time permits. The remaining requirement for a preliminary injunction, a substantial likelihood of success on the merits, requires consideration of each of the five major challenges raised by Plaintiffs, listed in Part I, C., *supra.* Only the first issue raised by Plaintiffs, the adequacy of the EIS, will be discussed in this opinion, however, as there was little evidence at the hearings concerning the remaining four issues and they present only questions of law. Since Plaintiffs have failed to sustain their burden of proof as to any of the other requirements for a preliminary injunction, deferment of consideration of the merits of these four issues until trial or appropriate motion will not result in any prejudice to Plaintiffs.

### A. The legal standards for evaluating an EIS

■ The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, directs federal agencies to prepare an environmental impact statement (EIS) for every major federal action that may have a significant effect on the quality of the human environment. 42 U.S.C. § 4332(2)(C). The primary purpose of an EIS is to ensure that the agency has environmental information before it at the time of its decisionmaking so that an informed decision can be made, but Congress did not intend to mandate perfection or to require that the statement document every particle of knowledge that an agency might compile in considering the proposed action. *Sierra Club v. Morton,* 510 F.2d 813, 819–20 (5th Cir. 1975).

The EIS is required to discuss:

1. the environmental impact of the proposed action;

2. any adverse environmental effects which cannot be avoided should the proposal be implemented;

3. alternatives to the proposed action;

4. the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

5. any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(2)(C). These are the statutory minima without which an EIS is legally deficient.

■ The role of a Court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978). Neither the statute nor its legislative history contemplates that a court should substitute its own judgment for that of the agency as to the environmental consequences of its actions. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken. *Id.,* quoting *Natural Resources Defense Council v. Morton,* 459 F.2d 827, 833 (5th Cir., 1972).

NEPA, while establishing significant substantive goals for the nation, imposes upon agencies duties that are essentially procedural. It was designed to insure a fully-informed and well-considered decision but not necessarily a decision this or any other Court would have made had we been members of the decisionmaking unit of the agency. *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); *Vermont Yankee, supra.* Nor does NEPA require an agency to elevate environmental concerns over other legitimate and appropriate considerations. *Strycker's Bay, supra*, 100 S.Ct. at 468 n. 16, 444 U.S. 225 at 438 n. 1b.

In evaluating the adequacy of environmental impact statements, the Courts have consistently enforced the "hard look" requirement tempered by a practical "rule of reason." *New York v. Kleppe*, 429 U.S. 1307, 97 S.Ct. 4, 50 L.Ed.2d 38 (1976) (Marshall as Circuit Justice). An EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible. *Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975). Applying the rule of reason, the Court's task is to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors. *Sierra Club v. Morton, supra*, 510 F.2d at 819.

Plaintiffs have asserted that the EIS is inadequate in several respects:

1. it fails to analyze the effects of the secondary growth the highway will induce.

2. it gives insufficient consideration to alternatives, particularly the alternative of building no highway and the alternative of locating the highway at US 27.

3. it omits various miscellaneous considerations which Plaintiffs believe should have been included.

**B.** *Consideration of induced development*

The EIS discusses secondary growth or induced development in several sections and concludes, as the evidence at these hearings seven years later has demonstrated, that the western areas of the County are "earmarked for development" (EIS, p. 26), and that development of the area "is foreseen for the near future, regardless of whether the Interstate highway is built" (p. 92). Since the future growth of this area was anticipated, even without the stimulus provided by the Interstate facility, the EIS states that the "major impacts of this facility would be to hasten, to some degree, the expected growth and to direct, to a large degree, the patterns of this growth." (p. 67). The interstate corridor would, therefore, "provide a long-term focal point for a more orderly development sequence and an opportunity for more effective land use planning, zoning, and development controls." (p. 92).

All of these statements are consistent with the evidence developed at the hearings on the preliminary injunction motion. Plaintiffs do not suggest what particular information on the EIS should have included regarding secondary growth other than to protest the statement's failure to evaluate the effects of secondary growth on the Aquifer, the Everglades, and other resources of the area. These effects, as noted in Part II, *supra*, have not been shown to be substantial.

More importantly, as the Court has found in Part III, *supra*, I–75 will not induce development in the study area. Though development will occur, it will not be and has not been in the first instance, because of the presence of the highway. Since only those results which are an "impact *of the proposed action*" (42 U.S.C. § 4332(2)(C)(i)) are required by NEPA to be discussed in an EIS, the statement is not defective for failure to consider effects caused by forces other than the highway.

**C.** *The no-build and US 27 alternatives*

Though NEPA requires "a detailed statement by the responsible official on . . . al-

**376**

ternatives to the proposed action," 42 U.S.C. § 4332(2)(C)(iii), it is obvious that the term "alternatives" is not self-defining. To make an impact statement something more than an exercise in frivolous boilerplate, the concept of alternatives must be bounded by some notion of feasibility. *Vermont Yankee, supra* at 551.

Plaintiffs complain that the EIS did not adequately address the alternatives of not building an interstate at all or of locating it at US 27, which were, respectively, the first and second choice recommendations of an Environmental Study Panel commissioned by FDOT to evaluate the effects of various alternative corridors for the highway. The Panel's report of September 1, 1971 (Exhibit B to the complaint) recommended first that no interstate highway be built and second, if it must be built, the majority of the experts on the Panel favored US 27 over the other alternative routes considered. This recommendation applied, however, to the Naples end of the highway, from Florida's west coast to Andytown. The Panel made *no* recommendation at all for the Andytown to Palmetto Expressway section of the highway involved in this lawsuit, stating that any route chosen by Florida DOT south from Andytown would be acceptable. The Panel participated in none of the corridor location public hearings for this section of I–75, as their primary concern was with the crossing of the Everglades by the east-west portion of the highway. (Ramos testimony).

When the project was later split into separate environmental impact statements for each of the two segments, there was no need for the impact statement for the Andytown to Palmetto section to consider recommendations made with reference to the Naples to Andytown segment. Thus, the EIS cannot be deemed inadequate in failing to address these Panel recommendations.

The no-build alternative was one of the preliminary alternatives considered during the formulation of the EIS. It is listed in the Summary section of the EIS as Alternate 5, but was "eliminated in the preliminary analysis phase because [it] would not satisfy the transportation needs of the area." The no-interstate alternate is further discussed in seven paragraphs at pp. 47–48 of the EIS. If the existing roads are not improved and no interstate is built, the system, which is "presently operating below satisfactory levels of traffic service, would experience further reductions in levels of service in the future. The two coastal expressways, Florida's Turnpike and Interstate 95, would become overloaded; county arterials would become congested; travel times, road user costs, accident rates and pollution levels on these arterials would increase to unacceptable levels." (p. 47). Accordingly, in the rapidly growing Southeast Florida region it would be unrealistic to expect that a no-expressway road network would be adequate. It would not serve the needs of the area and cannot be considered as practical. (p. 48).

Even with the planned improvements to existing roads and implementation of the proposed University Parkway, Port Everglades Parkway and Opa-Locka Expressway, the level of traffic service would be reduced, the use costs would be increased, and other necessary improvements would require a heavier commitment of state and local funds. Therefore, the EIS concludes, "the No-Interstate Alternate offers no advantages over the Interstate Alternates and was dropped from further consideration." (p. 48).

Also affecting the efficacy of the no-build alternative are the factors discussed in the EIS section (pp. 26–28) entitled "The Need for Interstate 75." These include such topics as "Existing and Projected Traffic Conditions," "Transportation Planning for the Study Area," "Role of I–75 in the Regional Transportation Network," and "Benefits to State, Region, and Communities."

Plaintiffs' witness Morris testified that, in his opinion, the EIS was inadequate in that it did not include a comparative analysis of traffic volumes for the area with and without I–75, a deficiency which Morris believes results in the inability of a decision-maker to determine whether there is a need for I–75. Ramos testified, however, that

the traffic forecasting methodology used in preparing the EIS was adequate and consistent with the state of the art at the time. The EIS (p. 1) refers to the traffic studies used as a basis for the need of an expressway in the study area—the Principal Street and Highway Plan of 1985 and another study mentioned by Ramos, the Traffic Waste Plan. Though the plans themselves are not attached to the EIS, they were available for inspection at the corridor location public hearings and at the local offices of FDOT. According to Ramos, there were extensive computer analyses of traffic volumes with and without the highway conducted in the preliminary phases of preparation of the EIS. These documents also were available for public inspection but were not attached to the EIS because they occupied several rooms of storage space.

Under such circumstances, it would be unreasonable to require that the EIS state in more detail the basis for the obvious conclusion that the no-build alternative would not serve the traffic needs of the area.

The US 27 alternative was also eliminated as a preliminary alternate because it likewise "would not satisfy the transportation needs of the area." (EIS Summary). This alternative is discussed further at pp. 44–47 of the EIS and rejected because it "would offer little service to the residents of the central portion of the study area," as US 27 constitutes the area's western boundary. Further, if US 27 was used as the I–75 location, "an eight-lane north-south expressway facility would still be needed in the Hiatus Road or Bonaventure Boulevard corridors." (p. 47). According to Ramos, then, the rejection of US 27 was a policy decision to build one road instead of two with less resulting damage to the environment and a consequent saving of public resources while still serving the public needs.

Several of Plaintiffs' witnesses expressed the opinion that the US 27 alternative would be less damaging to the environment than the proposed location in the center of the study area. Three of Plaintiffs' witnesses, however, (Wilson, Hartwell and Marshall) were members of the Environmental Study Panel which made the recommendations in 1970 as to the preferred location of the highway. As noted above, the Panel made *no* recommendations for and raised no environmental objections to the Andytown to Palmetto segment of I–75. Their opinions, expressed at these hearings, that US 27 is a better choice, come some nine years too late.

Not all of the experts agree, in any event, that US 27 is a better alternative. EPA recommended in 1973 that "[a] route be chosen that is as far removed from the Everglades and Conservation Area III as possible." (EIS, p. E–5). As US 27 directly adjoins the levee of Conservation Area III, it would be an undesirable site for the highway from EPA's standpoint. The South Florida Water Management District also favors placement of the highway as far as possible from the Conservation Area. Development along US 27 would appear to be more environmentally damaging than development in the proposed I–75 corridor because the Conservation Areas are more sensitive and productive than the stressed wetlands in the corridor area. (Rhoads testimony). At least one witness, Nicholas, believes that locating I–75 at US 27 would cause net additional development and a net population increase in Broward County. The development planned for the highway corridor would be shifted westward if US 27 was used; and since it is too late to stop the development which has already occurred and will continue around the present I–75 location, the westward movement of development might eliminate the "greenbelt" between I–75 and US 27. This greenbelt is an integral part of the County's Land Use Plan to control population in this area, and without it development would stretch from the coast through the study area and up to the levee of the Conservation Area.

Since "[a]n alternative which would result in similar or greater harm need not be discussed" *Sierra Club v. Morton, supra,* 510 F.2d at 825, the EIS is not defective for

failing to devote more attention to US 27 as an alternate.

D. *Miscellaneous objections to the EIS*

Plaintiffs assert in their motion that the "EIS fails to consider the adverse impacts of ancillary road construction projects connecting with and dependent upon the construction of I–75." (p. 14). The simple answer to this contention is that an EIS need only discuss the "impact of the proposed action," that is, the highway; there is no requirement that an EIS evaluate actions to be taken by state and local governments in conjunction with a federal project.

Witness Hartwell testified that, in his opinion, the EIS was deficient in failing to address the extent of backpumping into the Conservation Area caused by development in the study area. Mr. Marshall testified that the EIS should have included more discussion of the possible effects on the Everglades, including increased backpumping. The Environmental Study Panel, of which both Hartwell and Marshall were members, made no recommendation regarding backpumping, however, and its concern with the Everglades was directed to the east-west section of the highway from Naples to Andytown which crosses the true Everglades basin.

Plaintiffs further assert that "the EIS fails to consider the adverse economic and social impacts on neighboring communities which will likely suffer a decline in population and commerce as this development is drawn into the I–75 corridor." (Plaintiffs' motion p. 15). The evidence indicates, however, that all areas of South Florida are likely to increase in population, and it is precisely this increase which will necessitate the development of the study area, along with other areas, to provide for the needs of the increased population.

Even if Plaintiffs' contentions were factually and legally supported by the record, these are not the sort of inadequacies which would render an EIS defective judged by the rule of reason. While the Courts can and should require full, fair, and bona fide compliance with NEPA, this does not mean that the Courts are to "fly speck" environmental impact statements. *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir. 1974) (en banc).

Plaintiffs have, therefore, failed to establish that there is a substantial likelihood of success on the merits as to their claim that the EIS is inadequate.

VIII. *CONCLUSION*

Upon consideration of the evidence and the legal arguments made, the Court finds that Plaintiffs have failed to show: an irreparable injury; that the threatened harm to them outweighs the harm the requested injunction might do to Defendants; that the injunction would not disserve the public interest; and that they are likely to prevail on the merits of their claim that the EIS is inadequate. For all the foregoing reasons, it is

ORDERED AND ADJUDGED that Plaintiffs' motion for preliminary injunction be and it is hereby denied.